AO 108 (Rev. 06/09)  Application for a Warrant to Seize Property Subject to Forfeiture

# UNITED STATES DISTRICT COURT

### for the

### District of Arizona

| | | |
|---|---|---|
| In the Matter of the Seizure of | ) | |
| *(Briefly describe the property to be seized)* | ) | |
| | ) | Case No.  21-4346mb |
| Payward, Inc., dba Kraken, account AA18 N84G | ) | |
| AFUD MCBI | ) | |

## APPLICATION FOR A WARRANT
## TO SEIZE PROPERTY SUBJECT TO FORFEITURE

     I, a federal law enforcement officer or attorney for the government, request a seizure warrant and state under penalty of perjury that I have reason to believe that the following property in the _____ District of
_____ Arizona _____ is subject to forfeiture to the United States of America under ____ 18 ____ U.S.C. §
__ 981(a)(1)(A) __ *(describe the property)*:

Kraken account number AA18 N84G AFUD MCBI in the name of John P Lopez, subject to forfeiture pursuant to 18 USC § 981(a)(1)(A), 18 USC § 982(a)(1)

     The application is based on these facts:
See attached affidavit.

     ☑ Continued on the attached sheet.

Reviewed by AUSA James R Knapp

_____
*Applicant's signature*

Grant D. Nixon, Special Agent
*Printed name and title*

Sworn to before me ████████████████ .
     by telephone

Date:  11/08/2021

City and state:   Fragstaff, Arizona

Camille D. Bibles

Digitally signed by Camille
D. Bibles
Date: 2021.11.08 13:29:08
-07'00'

_____
*Judge's signature*

Hon. Camille D. Bibles, U.S. Magistrate Judge
*Printed name and title*

| Print | Save As... | Attach | Reset |
|---|---|---|---|

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

**Case No.**  21-4346mb

IN THE MATTER OF THE SEIZURE OF:

KRAKEN ACCOUNT AA18 N84G AFUD MCBI

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A WARRANT TO SEIZE PROPERTY SUBJECT TO FORFEITURE

I, Special Agent Grant D. Nixon, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I am a Special Agent of the Federal Bureau of Investigation (FBI) and have been employed in this capacity for over six years. I am currently assigned to the Albuquerque Division of the FBI, White Collar Crime Squad, and have primary investigative responsibility for public corruption and financial crimes. Throughout my career as a Special Agent with the FBI, I have conducted investigations involving financial crimes to include cases involving wire fraud, mail fraud, money laundering, and theft from the United States Government.

2.      The information set forth in this affidavit was derived from my own investigation and/or communicated to me by other law enforcement professionals, and from records and documents that I, and others, have reviewed.  I have not included every fact known to me concerning the investigation.  I have set forth only the facts that I believe are necessary to demonstrate probable cause for the issuance of the requested seizure and forfeiture warrants.

3.      I am familiar with the investigation of John Patrick Lopez (Lopez) doing business as Personal Money Management Company (PMMCO), involving allegations of violations of 18 U.S.C. § 1341: Mail Fraud; 18 U.S.C. § 1343: Wire Fraud; 18 U.S.C. § 371: Conspiracy; 18 USC § 2: Aiding and Abetting; 18 U.S.C. § 1956: Money Laundering; 18 U.S.C. § 1957: Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity; and/or 18 U.S.C. § 1348: Securities Fraud.

4.      I present this affidavit in support of an Application for the issuance of a Warrant to Seize Property Subject to Forfeiture, specifically the following account containing U.S. Dollars and multiple virtual currencies:

    **A.  Kraken account AA18 N84G AFUD MCBI in the name of John P Lopez;**

### STATUTORY PROVISIONS

5.      18 U.S. Code § 981: Civil Forfeiture: (a)(1) "The following property is subject to forfeiture to the United States: (A) Any property, real or personal, involved in a transaction or attempted transaction in violation of section 1956, 1957, or 1960 of this title, or any property traceable to such property."

6.      18 U.S. Code § 982: Criminal Forfeiture: (a)(1) "The court, in imposing sentence on a person convicted of an offense in violation of section 1956, 1957, or 1960 of this title, shall order

that the person forfeit to the United States any property, real or personal, involved in such offense, or any property traceable to such property."

## PROBABLE CAUSE

7.       Based upon the facts set forth in this affidavit, I submit that probable cause exists for the seizure of the subject virtual currency for civil and criminal forfeiture. The property is subject to civil forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) because it is property involved in transactions in violation of 18 U.S.C. § 1956. The property is subject to criminal forfeiture pursuant to 18 U.S.C. § 982(a)(1) because it is property involved in transactions in violation of 18 U.S.C. § 1956.

8.       I attached an affidavit composed in support of applications for search warrants in this matter (**Attachment A**); the affidavit details the investigation of Lopez and PMMCO. Based on my training and experience, I submit there is probable cause to believe Lopez is operating an investment scheme and fraudulently receiving and disbursing investor funds, as well as using such funds for personal gain. I submit probable cause exists that Lopez, and others known and unknown to me, committed violations of 18 U.S.C. § 1341: Mail Fraud; 18 U.S.C. § 1343: Wire Fraud; 18 U.S.C. § 371: Conspiracy; 18 USC § 2: Aiding and Abetting; 18 U.S.C. §1956: Money Laundering; 18 U.S.C. §1957: Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity; and/or 18 U.S.C. §1348: Securities Fraud. I incorporate the facts in **Attachment A** herein by reference.

9.       As detailed in **Attachment A**, law enforcement personnel conducted financial analyses of Lopez' and PMMCO's accounts. Lopez, acting individually and through PMMCO, utilized two Wells Fargo Accounts ending 5813 and 8961 to receive and disburse funds in furtherance of the investment fraud scheme. From December 17, 2013, to September 30, 2021, the two PMMCO

accounts received approximately $17,344,211.58 from investors. The following table

summarizes the combined activity in Lopez/PMMCO Wells Fargo accounts 5813 and 8961.

Financial Institution: Wells Fargo Bank
Account Name: John P Lopez DBA Personal Money Management
Account Holder: John P. Lopez

| | Account # | Statement Period |
|---|---|---|
| | ▮5813 | 12/17/2013 - 09/30/2021 |
| | ▮8961 | 03/01/2017 - 09/30/2021 |

OVERALL SUMMARY

| | Beg. Balance | $ | 259.52 |
|---|---|---|---|
| Category | Sum of CREDIT | | Sum of DEBIT |
| ATM/Branch currency withdrawal | | | $ (335,070.00) |
| Bank Fees | $ 290.70 | | $ (4,018.98) |
| Charles Schwab▮ 0451 - John P Lopez | $ 500,000.00 | | $ (1,119,000.00) |
| Check - copy not provided | | | $ (28,379.44) |
| Credit Card Advance/Payment | $ 37,247.95 | | $ (161,382.69) |
| Crypto Currency | $ 224,996.00 | | $ (249,990.00) |
| Currency Deposit | $ 97,862.00 | | |
| Deposit - copy not provided | $ 630,566.69 | | |
| Deposit/Wire Return | $ 33,000.00 | | $ (33,000.00) |
| Insurance | | | $ (475.00) |
| Interest | $ 8.91 | | |
| Internal Transfers - WF 8961 & 5813 | $ 4,883,220.50 | | $ (4,883,220.50) |
| Local Government | | | $ (11,761.75) |
| OneAZ CU▮ 9999 - John P Lopez DBA PMMCO | $ 37,000.00 | | |
| Other Credit | $ 0.23 | | |
| Payment - Coin Companies | $ 1,907,857.42 | | $ (11,431,011.10) |
| Payment - Investors | $ 17,344,211.58 | | $ (6,142,032.46) |
| Payment - Miscellaneous | $ 53,845.80 | | |
| Payroll | | | $ (36,593.96) |
| Postal Services | | | $ (4,098.65) |
| Rent | | | $ (14,250.00) |
| Retail Merchant/Services | | | $ (14,369.40) |
| Taxes | $ 13,711.28 | | $ (175,740.97) |
| Utilities | | | $ (19,849.25) |
| WF line of credit: ▮6817 | $ 6,000.00 | | $ (14,981.19) |
| WF line of credit: ▮8712 | | | $ (784.02) |
| WF Marion & John Lopez 6354 | $ 521,656.18 | | $ (781,210.00) |
| Withdrawal - copy not provided | | | $ (620,143.00) |
| **Grand Total** | **$ 26,291,475.24** | | **$ (26,081,362.36)** |
| | | | |
| | Ending Balance | $ | 210,372.40 |

10.     From December 17, 2013, to September 30, 2021, the Lopez/PMMCO Wells Fargo account ending 5813 received approximately $7,589,877.60 from investors. The funds received by wire transfer or electronic deposit totaled approximately $3,074,290.38. The funds deposited via check totaled approximately $4,515,587.22. The following table summarizes the activity in Lopez/PMMCO Wells Fargo account 5813.

Financial Institution: Wells Fargo Bank
Account Name: John P Lopez DBA Personal Money Management
Account Holder: John P. Lopez
Account #: ▇5813
Statement Period: 12/17/2013 - 09/30/2021

| | Beg. Balance | | $ | 259.52 |
|---|---|---|---|---|
| Category | Sum of CREDIT | | Sum of DEBIT | |
| ATM/Branch currency withdrawal | | | $ | (329,070.00) |
| Bank Fees | $ | 50.70 | $ | (3,298.98) |
| Charles Schwab ▇0451 - John P Lopez | $ | 500,000.00 | $ | (875,000.00) |
| Check - copy not provided | | | $ | (28,379.44) |
| Credit Card Advance/Payment | $ | 37,247.95 | $ | (161,382.69) |
| Crypto Currency | $ | 224,996.00 | $ | (224,990.00) |
| Currency Deposit | $ | 94,862.00 | | |
| Deposit - copy not provided | $ | 111,548.00 | | |
| Deposit/Wire Return | $ | 33,000.00 | $ | (33,000.00) |
| Insurance | | | $ | (475.00) |
| Internal Transfers - WF 8961 & 5813 | $ | 4,208,600.50 | $ | (674,620.00) |
| Local Government | | | $ | (11,761.75) |
| OneAZ CU ▇9999 - John P Lopez DBA PMMCO | $ | 37,000.00 | | |
| Other Credit | $ | 0.23 | | |
| Payment - Coin Companies | $ | 492,457.42 | $ | (6,534,686.10) |
| Payment - Investors | $ | 7,589,877.60 | $ | (3,907,301.40) |
| Payment - Miscellaneous | $ | 47,647.96 | | |
| Payroll | | | $ | (36,593.96) |
| Postal Services | | | $ | (4,098.65) |
| Rent | | | $ | (14,250.00) |
| Retail Merchant/Services | | | $ | (14,369.40) |
| Taxes | $ | 13,711.28 | $ | (175,740.97) |
| Utilities | | | $ | (19,849.25) |
| WF line of credit: ▇6817 | $ | 6,000.00 | $ | (14,981.19) |
| WF line of credit: ▇8712 | | | $ | (784.02) |
| WF Marion & John Lopez 6354 | $ | 521,656.18 | $ | (771,210.00) |
| Withdrawal - copy not provided | | | $ | (55,143.00) |
| **Grand Total** | **$** | **13,918,655.82** | **$** | **(13,890,985.80)** |

| | Ending Balance | | $ | 27,929.54 |
|---|---|---|---|---|

11.     From March 1, 2017, to September 30, 2021, the Lopez/PMMCO Wells Fargo account

ending 8961 received approximately $9,754,333.98 in check payments from investors. The

following table summarizes the activity in Lopez/PMMCO account 8961.

Financial Institution: Wells Fargo Bank
Account Name: John P Lopez DBA Personal Money Management
Account Holder: John P. Lopez
Account #: ████ 8961
Statement Period: 03/01/2017 - 09/30/2021

|  | Beg. Balance | $ | - |
| --- | --- | --- | --- |
| Category | Sum of CREDIT | Sum of DEBIT | |
| ATM/Branch currency withdrawal |  | $ | (6,000.00) |
| Bank Fees | $ 240.00 | $ | (720.00) |
| Charles Schwab ████ 0451 - John P Lopez |  | $ | (244,000.00) |
| Crypto Currency |  | $ | (25,000.00) |
| Currency Deposit | $ 3,000.00 |  | |
| Deposit - copy not provided | $ 519,018.69 |  | |
| Interest | $ 8.91 |  | |
| Internal Transfers - WF 8961 & 5813 | $ 674,620.00 | $ | (4,208,600.50) |
| Payment - Coin Companies | $ 1,415,400.00 | $ | (4,896,325.00) |
| Payment - Investors | $ 9,754,333.98 | $ | (2,234,731.06) |
| Payment - Miscellaneous | $ 6,197.84 |  | |
| WF Marion & John Lopez 6354 |  | $ | (10,000.00) |
| Withdrawal - copy not provided |  | $ | (565,000.00) |
| **Grand Total** | **$ 12,372,819.42** | **$** | **(12,190,376.56)** |

|  | Ending Balance | $ | 182,442.86 |
| --- | --- | --- | --- |

12.     Lopez and his wife Marion Lopez (M. Lopez) also maintain a personal Wells Fargo

account with last four digits 6354. Law enforcement analyzed activity in this account. From July

30, 2012, to October 18, 2021, account 6354 received approximately $819,260[1] in funds

---

[1] Wells Fargo Bank produced documents which spanned a longer period for account 6354 than for account 5813.   Due to the difference in the time period analyzed, the amount reflected in analysis of 6354 is larger by approximately $48,050.00 than the amount reflected in analysis of account 5813.

transfers from Wells Fargo account ending 5813 and $10,000 in funds transfers from Wells Fargo account ending 8961. While the analysis revealed $523,556.18 in funds transfers from personal account 6354 to Lopez/PMMCO account 5813, $520,556.18 was from a single transfer on May 19, 2020. The funds originated from an investor check deposited on May 18, 2020; the following day the funds of this check were transferred to account 5813. Personal account 6354 also received $25,000 in investor funds from Lopez's Evolve Bank account. The following table summarizes activity in account 6354.

Financial Institution: Wells Fargo Bank
Account Name: Marion S Lopez, John P Lopez
Account Holder: Marion S Lopez, John P Lopez
Account #: ████6354
Account Type: Personal checking
Statement Period: 10/15/2008 - 10/18/2021

|  | Beg. Balance | $ | 635.69 |
|---|---|---|---|
| **Category** | **Sum of CREDIT** | **Sum of DEBIT** | |
| ATM/Branch Currency Withdrawal | $ (60.00) | $ (41,310.00) | |
| Bank Fees | $ 164.50 | $ (2,501.65) | |
| Check - copy not provided | | $ (383,602.14) | |
| Credit Card Advance/Payment | $ 20,122.00 | $ (511,455.92) | |
| Crypto Currency | | $ (351,505.00) | |
| Currency Deposit | $ 177,430.00 | | |
| Deposit - copy not provided | $ 493,157.38 | | |
| Dining/Groceries | | $ (35,952.98) | |
| Education | | $ (491.04) | |
| Insurance | | $ (26,087.63) | |
| Loan Payment | $ 2,700.00 | $ (1,548.46) | |
| Local Government | $ 4.45 | $ (14,624.31) | |
| Medical | $ 45.00 | $ (9,412.06) | |
| OneAZ CU ████ 0062 - Marion S Lopez, John P Lopez | $ 54,200.00 | | |
| Overdraft - WF Line of credit: ████8712 | $ 1,997.00 | | |
| Payment - Coin Companies | | $ (1,854.42) | |
| Payment - Investors | $ 545,556.18 | $ (25,000.00) | |
| Payment - Miscellaneous | $ 4,973.16 | $ (10,295.57) | |
| Payroll | $ 58,175.44 | | |
| Retail Merchant/Services | $ 1,524.66 | $ (125,295.34) | |
| Taxes | $ 376.00 | $ (13,802.96) | |
| Transfer - unknown WF account | $ 7.17 | | |
| Utilities | | $ (45,778.40) | |
| WF John P Lopez DBA Personal Money Management 5813 | $ 819,260.00 | $ (523,556.18) | |
| WF John P Lopez DBA Personal Money Management 8961 | $ 10,000.00 | | |
| WF John P Lopez DBA Personal Money Management 9317 | $ 75.00 | $ (1,875.00) | |
| WF line of credit: ████6817 | $ 2,600.00 | $ (28,013.40) | |
| WF line of credit: ████8712 | | $ (2,293.14) | |
| Withdrawal - copy not provided | | $ (35,000.00) | |
| **Grand Total** | **$ 2,192,307.94** | **$ (2,191,255.60)** | |

|  | Ending Balance | $ | 1,688.03 |
|---|---|---|---|

13.     As detailed in **Attachment A**, Lopez opened accounts with Payward Ventures, Inc.,

doing business as Kraken, and Evolve Bank and Trust. Records from Payward and Evolve show

that Lopez provided his personal information to open the accounts, including his Arizona

driver's license and home address. The investigation revealed that the Evolve account receives

deposits in United States Dollars and the funds are transferred to the connected Kraken account.

After a user's Kraken account receives U.S. Dollars from Evolve or another of Payward's

banking partners, the funds can be traded into and between virtual currencies. Kraken holds

virtual currencies on behalf of users.

14.     From in or about November 2017 to in or about August 2021, Lopez's Kraken account

AA18 N84G AFUD MCBI received approximately $249,990 from Lopez/PMMCO Wells Fargo

account 5813. The Kraken account also received approximately $351,505 from Lopez' and M.

Lopez's personal Wells Fargo account 6354. Approximately $224,996 was transferred from the

Kraken account back to Wells Fargo account 5813.

15.     In or about August 2021, Lopez's Kraken account AA18 N84G AFUD MCBI contained

approximately $194.02 and the following virtual currencies: 6.07 Bitcoin, 4.00 Ethereum, 0.19

Litecoin, and 0.08 Bitcoin Cash.

16.     As detailed in **Attachment A**, Lopez claims to provide personal investment services

through PMMCO; specifically, Lopez represents that PMMCO contracts with Charles Schwab to

invest client funds. Lopez further claims that PMMCO generates returns in excess of the market

by using a timing model to predict when to buy and sell exchange-traded funds, debt, and/or

bonds. However, your affiant's review of PMMCO and Lopez's accounts did not reveal trades

and/or returns consistent with Lopez's representations. As such, I submit there is probable cause

to believe that Lopez violated 18 U.S.C. § 1343 by fraudulently receiving investor funds by wire

transfer and/or electronic deposit. Lopez/PMMCO accounts 5813 and 8961 also received funds by check. As shown in **Attachment A**, I submit there is probable cause to believe that Lopez sent emails for the purpose of lulling investors and giving them a false sense of security in their investment gains by providing account statements and investment updates that were materially misstated.  Therefore, I submit there is probable cause to believe Lopez facilitated and perpetuated the scheme by sending lulling wires to investors in violation of 18 U.S.C. § 1343. Based on the details of Lopez's scheme in the attached affidavit and the discussion above, your affiant submits there is probable cause that Lopez/PMMCO Wells Fargo accounts 5813 and 8961 received a combined $17,344,211.58 in proceeds traceable to violations of 18 U.S.C. § 1343.

17.     I further submit there is probable cause to believe Lopez knew the approximately $829,260 transferred to personal account 6354 represented proceeds of some form of unlawful activity. By transferring the funds from PMMCO accounts to a personal account shared with his wife, Lopez concealed the source of the funds as proceeds of wire fraud derived from property of investors. Furthermore, commingling the proceeds with the funds in the personal account concealed the nature of the proceeds of wire fraud. Therefore, Lopez and M. Lopez's Wells Fargo account ending 6354 is property involved in money laundering.

18.     As discussed above and in **Attachment A**, Kraken account AA18 N84G AFUD MCBI received an approximate combined total of $601,495 from Lopez/PMMCO Wells Fargo account 5813 and personal Wells Fargo account 6354. I submit that there is probable cause to believe Lopez knew the funds were proceeds of some form of unlawful activity. By placing the funds in his personal virtual currency exchange account, Lopez concealed the source of the funds as proceeds of wire fraud derived from property of PMMCO's investors. Lopez converted funds into various virtual currencies, further concealing the source and nature of the funds as U.S.

Dollar proceeds of wire fraud. While investigators possess records from August 2021, any subsequent transactions by Lopez in Kraken account AA18 N84G AFUD MCBI represent continuing money laundering activity.

19.    I submit probable cause exists for the seizure of Lopez's Kraken account AA18 N84G AFUD MCBI, to include all funds in U.S. Dollars and virtual currency. The account is subject to civil forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) and criminal forfeiture pursuant to 18 U.S.C. § 982(a)(1) because it is property involved in money laundering transactions in violation of 18 U.S.C. § 1956.

20.    Based on the information presented in this affidavit and the cited sections of the U.S Code, I am requesting a warrant to seize Lopez's Kraken account AA18 N84G AFUD MCBI.


11/08/2021
_____
Executed on (Date)

Grant D. Nixon, Special Agent
Federal Bureau of Investigation


Camille D. Bibles

Digitally signed by Camille D. Bibles
Date: 2021.11.08 13:29:38 -07'00'

___x___Sworn by telephone

Hon. Camille D. Bibles
U.S. Magistrate Judge

# ATTACHMENT A

SEALED

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION **2677 East 7th Ave., Suite 2 Flagstaff, Arizona 86004**, a single level office building with multiple tenants; **2001 Audi A6 Arizona License Plate LFK219**, a vehicle; **2007 Toyota 4Runner Arizona License Plate FLRTRKR,** a vehicle; and **1996 Nissan Truck Arizona License Plate 909AZY**, a vehicle**.** | Case No. 21-4339mb <br><br> **Filed Under Seal** |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Grant D. Nixon, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules

of Criminal Procedure for a warrant to search the premises located at 2677 East 7th Ave., Suite 2

Flagstaff, Arizona 86004, to include a 2001 Audi A6 Arizona License Plate LFK219, a 2007

Toyota 4Runner Arizona License Plate FLRTRKR, and 1996 Nissan Truck Arizona License Plate

909AZY**.** (hereafter referred to as "the Residence"), further described in Attachment A, for the

items described in Attachment B.

2.      I am a Special Agent of the Federal Bureau of Investigation (FBI) and have been

employed in this capacity for over six years. I am currently assigned to the Albuquerque Division

of the FBI, White Collar Crime Squad, and have primary investigative responsibility for public

corruption and financial crimes. Throughout my career as a Special Agent with the FBI, I have

conducted investigations involving financial crimes to include cases involving wire fraud, mail

fraud, money laundering, and theft from the United States Government (USG).

SEALED

3.      I make this affidavit based on personal knowledge, review of evidence obtained and information provided by witnesses, cooperating witnesses, and other sources. The information in this affidavit is for the limited purpose of establishing probable cause for the requested Search and Seizure Warrant and does not include every detail of the investigation.  I have only set forth the specific facts that I believe are necessary to establish probable cause to search the premises described in Attachment A for the items described in Attachment B.

4.      Based on my training and experience and the facts set forth in this affidavit, I submit probable cause exists that violations of 18 U.S.C. § 1341: Mail Fraud; 18 U.S.C. § 1343: Wire Fraud; 18 U.S.C. § 371: Conspiracy; 18 USC § 2: Aiding and Abetting; 18 U.S.C. § 1956: Money Laundering; 18 U.S.C. § 1957: Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity; and/or 18 U.S.C. § 1348: Securities Fraud have been committed by John Lopez (J. Lopez) and others known and unknown to me.  I submit probable cause also exists to search the premises located at 2677 East 7th Ave., Suite 2 Flagstaff, Arizona 86004, to include a 2001 Audi A6 Arizona License Plate LFK219, a 2007 Toyota 4Runner Arizona License Plate FLRTRKR, and 1996 Nissan Truck Arizona License Plate 909AZY for evidence, instrumentalities, or fruits of these crimes as described in Attachment B. A more full description of the residence and vehicles are provided in Attachment A.

## **JURISDICTION**

5.      This Court has jurisdiction to issue the requested warrant because it is "a magistrate judge with authority in the district" and the property at issue is "located within the district."  Fed. R. Crim. P. 41(b)(1).

## **PROBABLE CAUSE**

SEALED

6.      The FBI is conducting an investigation of Mail Fraud, Wire Fraud, Securities Fraud, Money Laundering and Conspiracy scheme in the District of Arizona and elsewhere.  During this investigation, agents identified J. Lopez as the leader of the investment scheme further described in this affidavit. J. Lopez represents himself to be the President and Founder of Personal Money Management Company (PMMCO). J. Lopez conducts his investment fraud scheme through PMMCO. Marion Lopez (M. Lopez), Lopez's wife, identifies as an assistant manager of PMMCO. Yolonda Avina (Avina) is an office manager for PMMCO.

7.      Your affiant learned J. Lopez solicited investors to invest with PMMCO from New Mexico, Arizona, and other states. J. Lopez represents that PMMCO has been in business over 30 years. PMMCO offers multiple types of investments. J. Lopez represents PMMCO is able to obtain guaranteed returns and higher rates of returns than the market by making trades using an investment model he created years ago. However, as discussed later in the affidavit, J. Lopez's and PMMCO's accounts do not reveal ETF[1] trading and/or returns as consistent with J. Lopez's representations. Rather J. Lopez's and PMMCO's accounts reveal a comingling of investors' money, investors' money going to coin shops for purchases, payments to other investors, transfers to J. Lopez's personal Charles Schwab investment account, currency withdrawals, and/or transfers to J. Lopez's personal accounts. The term "investor" is used within the affidavit regarding individuals that provided money to J. Lopez and/or PMMCO. Your affiant believes this term is consistent as ostensibly the reason for the contribution to J. Lopez and/or PMMCO is for investment purposes. Based on the contents of the affidavit, I submit there is probable cause to

---

[1] According to schwab.com "ETFs or 'exchange-traded funds' are exactly as the name implies: funds that trade on exchanges, generally tracking a specific index. When you invest in an ETF, you get a bundle of assets you can buy and sell during market hours- potentially lowering your risk and exposure, while helping to diversity your portfolio."

SEALED

believe the investors are victims. Your affiant has not interviewed every investor.  PMMCO is actively recruiting new "investors."

### IDENTIFIERS AND ADDRESSES ASSOCIATED WITH LOPEZ AND PMMCO

8.      J. Lopez represents himself as the president and founder of PMMCO. J. Lopez, Year of Birth (YOB) 1951, resides at 2939 E. Matterhorn Drive Flagstaff, Arizona 86004. Agents observed multiple vehicles registered to J. Lopez at 2939 E. Matterhorn Drive in September 2021, to include a Nissan truck with Arizona license plate 909AZY and Toyota 4Runner with AZ license plate FLRTRKR. Your affiant reviewed Arizona Motor Vehicle Division records revealed Lopez was issued an Arizona driver's license in March 2021.  That driver's license lists his residence as 2939 E. Matterhorn Drive Flagstaff, Arizona 86004.

9.      M. Lopez (YOB 1943) has a LinkedIn account that represents she is an assistant manager at PMMCO. Your affiant reviewed Arizona Motor Vehicle Division records showing M. Lopez was issued an Arizona driver's license in April 2018. That driver's license lists her residence as 2939 E. Matterhorn Drive Flagstaff, Arizona 86004.

10.     Avina, YOB 1963, is an office manager for PMMCO. Your affiant reviewed Arizona Motor Vehicle Division records revealed Avina was issued an Arizona driver's license in December 2020.  That driver's license lists her residence as 2926 S Tex Ln Flagstaff, Arizona 86001.

### *PMMCO*

11.     PMMCO was incorporated in California in or about December 1996. J. Lopez was the only listed Director for PMMCO at the time of incorporation. At the time of incorporation, the listed address for PMMCO was 467 Saratoga Avenue #609 San Jose, California 95129. According to open source, this address corresponds to a packaging service. "PMMCo." filed a "Privilege

SEALED

(Sales) Tax and Occupational Business License Application" with the City of Flagstaff, Arizona, dated July 30, 2013. The Application was for a new business and the nature of the business was listed as "Financial Consulting"; J. Lopez was the only individual listed as an owner, partner, individual, or LLC member. The address listed on the application for "PMMCo." was PO Box 31400 Flagstaff, AZ 86003, and the associated business phone number was 928-714-0473.  The city of Flagstaff issued a Business License to "John P. Lopez" doing business as (dba) Personal Money Management Co. with a business location 2677 7th Ave Ste 2 Flagstaff, Arizona 86004 and expiration date June 30, 2022. According to data pulled from Dun and Bradstreet Market Identifier Records, PMMCO has two employees.

12.     PMMCO operates from 2677 East 7th Ave., Suite 2 Flagstaff, Arizona 86004. Agents observed an individual believed to be J. Lopez in the parking lot of 2677 East 7th Ave., Suite 2 Flagstaff, Arizona 86004, in September 2021, exiting the aforementioned Nissan Truck.  Agents observed "Personal Money Management Co." on the door of 2677 East 7th Ave., Suite 2 Flagstaff, Arizona 86004.

## INITIATION OF INVESTIGATION

13.     In July 2021, an investment advisor for New York Life, RM, contacted Albuquerque Division of FBI regarding J. Lopez dba PMMCO. RM stated J. Lopez offered investment returns that were suspiciously high. Also, J. Lopez offered guaranteed one year certificate of deposits with a guaranteed 10% yield. While J. Lopez could be considered a competitor to RM, I consider the information RM provided to be reliable because much of the information was corroborated through other recordings and/or documents obtained in the investigation.

## ACCOUNT ANALYSIS

14.     Your affiant and others performed a financial analysis on accounts associated with J. Lopez and PMMCO. The accounts included PMMCO's business accounts, J. Lopez's personal accounts, and J. Lopez's investment accounts. Based on the analysis, two additional PMMCO accounts were identified at Wells Fargo Bank (accounts ending in 5813 and 8961) as well as one more PMMCO account at One AZ Credit Union. Besides these, J. Lopez and M. J. Lopez had personal accounts at Wells Fargo and at One AZ Credit Union. J. Lopez had two personal accounts at Charles Schwab (accounts ending in 0451 and 6806), and one at Payward Ventures/Evolve Bank and Trust. The various accounts are discussed below.  J. Lopez also had multiple credit cards and/or lines of credits.

***PMMCO Wells Fargo- PMMCO 5813 and 8961***

15.     PMMCO Wells Fargo Accounts ending 5813 and 8961 are summarized below. [Note: the below table combines the accounts.]

SEALED

Financial Institution: Wells Fargo Bank
Account Name: John P Lopez DBA Personal Money Management
Account Holder: John P. Lopez

| | Account # | Statement Period |
|---|---|---|
| | ▉5813 | 12/17/2013 - 09/30/2021 |
| | ▉28961 | 03/01/2017 - 09/30/2021 |

OVERALL SUMMARY

| | Beg. Balance | $ | 259.52 |
|---|---|---|---|
| Category | Sum of CREDIT | Sum of DEBIT | |
| ATM/Branch currency withdrawal | | $ | (335,070.00) |
| Bank Fees | $ 290.70 | $ | (4,018.98) |
| Charles Schwab ▉ 0451 - John P Lopez | $ 500,000.00 | $ | (1,119,000.00) |
| Check - copy not provided | | $ | (28,379.44) |
| Credit Card Advance/Payment | $ 37,247.95 | $ | (161,382.69) |
| Crypto Currency | $ 224,996.00 | $ | (249,990.00) |
| Currency Deposit | $ 97,862.00 | | |
| Deposit - copy not provided | $ 630,566.69 | | |
| Deposit/Wire Return | $ 33,000.00 | $ | (33,000.00) |
| Insurance | | $ | (475.00) |
| Interest | $ 8.91 | | |
| Internal Transfers - WF 8961 & 5813 | $ 4,883,220.50 | $ | (4,883,220.50) |
| Local Government | | $ | (11,761.75) |
| OneAZ CU ▉ 9999 - John P Lopez DBA PMMCO | $ 37,000.00 | | |
| Other Credit | $ 0.23 | | |
| Payment - Coin Companies | $ 1,907,857.42 | $ | (11,431,011.10) |
| Payment - Investors | $ 17,344,211.58 | $ | (6,142,032.46) |
| Payment - Miscellaneous | $ 53,845.80 | | |
| Payroll | | $ | (36,593.96) |
| Postal Services | | $ | (4,098.65) |
| Rent | | $ | (14,250.00) |
| Retail Merchant/Services | | $ | (14,369.40) |
| Taxes | $ 13,711.28 | $ | (175,740.97) |
| Utilities | | $ | (19,849.25) |
| WF line of credit: ▉6817 | $ 6,000.00 | $ | (14,981.19) |
| WF line of credit: ▉8712 | | $ | (784.02) |
| WF Marion & John Lopez 6354 | $ 521,656.18 | $ | (781,210.00) |
| Withdrawal - copy not provided | | $ | (620,143.00) |
| **Grand Total** | **$ 26,291,475.24** | **$ (26,081,362.36)** | |
| | | | |
| | Ending Balance | $ | 210,372.40 |

16.     The accounts illustrated above appear to be the primary accounts used to operate

PMMCO. From on or about December 2013 to on or about September 2021, the two PMMCO

SEALED

accounts took in approximately $17,344,211.58 from investors and paid out approximately $6,142,032.46 to investors and/or for their benefit.

17.  Payments to multiple coin companies totaled approximately $11,431,011.10 and approximately $1,907,857.42 was received from coin companies. (See chart below which represents net purchases/sales to the companies).

| CATEGORY | Payment - Coin Companies   NET | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **Sum of Amount** | **Year** | | | | | | | | |
| **Name of Coin Company** | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | Grand Total |
| American Bullion & Coin | $ 9,150.00 | $ (229,098.58) | $ (339,279.20) | $ (349,315.00) | $ (209,601.90) | $ (691,074.90) | $ (410,170.50) | $ 79,530.00 | $ (2,139,860.08) |
| Coin Heaven | $ (24,050.00) | $ (10,870.10) | | | | | | | $ (34,920.10) |
| Discount Gold and Silver Trading Co | | | | $ (212,500.00) | $ (201,000.00) | $ (1,156,570.00) | $ (1,899,205.00) | $ (3,127,285.00) | $ (6,596,560.00) |
| Renaissance Precious Metals | $ (54,288.00) | | | | | | | | $ (54,288.00) |
| Route 66 Coin & Collectibles | | | | | | | | $ (697,525.50) | $ (697,525.50) |
| **Grand Total** | **$ (69,188.00)** | **$ (239,968.68)** | **$ (339,279.20)** | **$ (561,815.00)** | **$ (410,601.90)** | **$ (1,847,644.90)** | **$ (2,309,375.50)** | **$ (3,745,280.50)** | **$ (9,523,153.68)** |

18.  Route 66 Coin & Collectibles previously operated as American Bullion & Coin. They are located in Flagstaff, Arizona. Per their website, on or about September 16, 2021, under their "About Us" section it states, "…When you invest with Route 66 Coin & Collectible, LLC you take physical possession of 100% of your investment…." Their website under "Our Services" describes that, "At Route 66 Coin & Collectibles, LLC our staff is here to help educate and assist our clients with precious metals and rare coin investing…Our experienced staff is here to advise you in making the right investment decisions specific to your personal situation…."

19.  As of approximately September 16, 2021, the Discount Gold and Silver Trading website lists a P.O. Box in Berlin, Maryland. Under the "FAQ" section of their website, it represents, "We provide all forms of precious metals including gold, silver, platinum and palladium…" Further, they offer "Self-directed Precious Metals IRA."

20.  From on or about December 2013, to on or about July 2021, transfers to J. Lopez's personal Charles Schwab accounts 0451 and 6806 totaled approximately $1,119,000.00.

SEALED

Approximately $500,000.00 was transferred back from J. Lopez's Schwab account 0451 to PMMCO's Wells Fargo 5813. The only transfers to a Charles Schwab account from the above PMMCO Wells Fargo accounts 5813 and 8961, went to J. Lopez's personal Charles Schwab account 0451. Approximately $335,070.00 in currency was withdrawn and approximately $161,382.69 was paid to credit card companies.

***Specific Transactions***

21.     On or about March 2, 2018, DL, an investor, wire transferred approximately $76,655.17 into one of PMMCO's Wells Fargo accounts. Bank records show that prior to DL's deposit, PMMCO's combined Wells Fargo balance was approximately $3,615.01. On or about March 5, 2018, PW and JW, who are believed to be investors, deposited approximately $10,300 into the Wells Fargo 5813 PMCCO account. The memo on the check was "All Weather Strategy." From on or about March 2, 2018, to March 9, 2018, other investors deposited approximately $6,100 into Wells Fargo PMMCO accounts. From on or about March 6, 2018, to on or about March 9, 2018, an individual initiated a transfer of approximately $50,000 to J. Lopez's and M. J. Lopez's personal Wells Fargo 6354 account. The money deposited into J. Lopez's 6354 account was used to send two wire transfers of $25,000 each to J. Lopez's Payward Venture account.

22.     On or about November 27, 2018, AY, an investor, deposited approximately $330,185.18 into one of PMMCO's Wells Fargo accounts. Prior to the deposit, PMMCO's Wells Fargo accounts had a combined net balance of $18,832.52. AY's deposit brought the PMMCO's Wells Fargo combined accounts balance to approximately $349,017.70. From on or about November 27, 2018, to on or about December 3, 2018, no additional deposits were made into PMMCO's Wells Fargo accounts; therefore AY's deposit constituted the majority of funds in PMMCO Wells Fargo accounts during this period. On or about December 3, 2018, a wire transfer

of approximately $225,000 was sent from PMMCO's Wells Fargo account 5813 to J. Lopez's Charles Schwab account 0451.

23.    On or about March 6, 2019, JV, an investor, deposited approximately $100,000 into one of PMMCO's Wells Fargo accounts. Prior to the deposit, PMMCO's combined Wells Fargo accounts had a net balance of $77,019.23, bringing the PMCCO Wells Fargo combined balance to approximately $177,019.23. From on or about March 6, 2019, to on or about March 18, 2019, no additional deposits were made. On or about March 8, 2019, a wire transfer of approximately $50,000 was sent from PMMCO's Wells Fargo account 8961 to J. Lopez's Charles Schwab account 0451.

*Charles Schwab- 0451*

24.    Your affiant reviewed documents obtained from Charles Schwab related to account ending in 0451. Schwab provided a document titled "Open a Schwab Account Today" which listed the account holder as "John P. Lopez" and home address 2939 E. Matterhorn Dr. Flagstaff, Arizona 86004. J. Lopez listed his occupation as "MKTING MGR" at "SUN MICROSYSTEMS" in Palo Alto, California.  See below for summary of Charles Schwab 0451.

SEALED

Financial Institution: Charles Schwab
Account Name: John Patrick Lopez
Account Holder: John Patrick Lopez
Account #: ▇ 0451
Account Type: Schwab One
Statement Period: 08/01/2011 - 06/30/2021

| | Beg. Balance | $ 34,337.55 |
|---|---|---|
| Category | Sum of CREDIT | Sum of DEBIT |
| Bank deposit - from brokerage | | $ (27,800.00) |
| Bank Fees | $ 175.00 | $ (182.10) |
| Cash Dividend | $ 3,154.43 | |
| Change in Value of Investments | $ 16,275.82 | $ (79,975.76) |
| Check - copy not provided | | $ (36,000.00) |
| Exchange Traded Fund Purchase/Sale | $ 6,762,539.66 | $ (6,762,539.66) |
| Interest Earned | $ 994.21 | |
| Payment - Coin Companies | | $ (367,807.91) |
| Transfer - Charles Schwab ▇ 6806 | $ 27,800.00 | |
| Wells Fargo ▇ 8961 - John P Lopez | $ 244,000.00 | |
| Wells Fargo ▇ 5813 - John P Lopez | $ 875,000.00 | $ (500,000.00) |
| **Grand Total** | **$ 7,929,939.12** | **$ (7,774,305.43)** |
| | Ending Balance | $ 189,971.24 |

25.     As illustrated above, from in or about August 2011, to in or about June 2021, approximately $875,000 was transferred in from PMMCO's Wells Fargo 5813 account and approximately $244,000 was transferred in from PMMCO's Wells Fargo account 8961. Approximately $500,000 returned to PMMCO's Wells Fargo 5813 account. The change in investments represents trades made within the account, which had gains of approximately $16,275.82 and losses of approximately $79,975.76, which netted a loss of approximately $63,699.94.  On or about November 20, 2018, approximately $367,807.91 was sent via a wire transfer to American Bullion and Coin.

**Charles Schwab- 6806**

26.     J. Lopez had a second Charles Schwab account, ending 6806, which had a balance of approximately $40,107.37 in or about August 2011. Your affiant reviewed documents provided

from Charles Schwab for account ending in 6806 and the account was opened as a "Rollover IRA" on or about August 27, 2010.  From in or about August 2011, to on or about June 30, 2021, no money was transferred into the account. The net change in investments, which represents trades made within the account, netted a loss of approximately $12,291.07. In or about January and February 2012, approximately $27,800.00 was transferred to J. Lopez's Schwab account 0451.

***Payward and Evolve Bank and Trust***

27.     Your affiant reviewed documents obtained from Payward Ventures, Inc., dba as Kraken. Furthermore, your affiant reviewed documents from Evolve Bank and Trust. Payward Ventures has a platform that allows individuals to trade cryptocurrency. Clients deposit United States Dollars into accounts at Evolve Bank and Trust, which are then transferred to their Payward accounts.

28.     On or about September 15, 2017, J. Lopez opened an account with Payward Ventures Inc. The account name was "John P Lopez," and had an address of 2939 East Matterhorn Drive Flagstaff, Arizona 86004. In the account opening and verification documents, there was an Arizona driver's license with J. Lopez's identifiers, as well as an address of 2939 East Matterhorn Drive Flagstaff, Arizona 86004. In the account opening and verification documents, there was a City of Flagstaff document that appeared to be for city billing and had J. Lopez's name, as well as the 2939 East Matterhorn Drive Flagstaff, Arizona 86004.

29.     From in or about November 2017, to in or about August 2021, approximately $249,990.00 was deposited into J. Lopez's Payward account from PMMCO's Wells Fargo 5813 account. Approximately $351,505.00 was deposited into J. Lopez's Payward account from J. Lopez's and M. J. Lopez's personal Wells Fargo account 6354. See below for further discussion of J. Lopez's and M. Lopez's personal Wells Fargo account 6354. On or about, August 18, 2021,

SEALED

the value of the account was approximately $285,681.22, which is an unrealized net loss of approximately $90,817.78.

30.     On or about November 22, 2017, J. Lopez opened an account with Evolve Bank and Trust. The documents provided by Evolve Bank and Trust represent that the "Platform" was "Kraken" which is a trading platform for crypto currency. The account was a "Personal" account. Furthermore, your affiant reviewed J. Lopez's August 2021 statement from Evolve Bank and Trust which revealed an address of "2939 E Matterhorn Drive Flagstaff, AZ 86004". Among the account-opening paperwork J. Lopez submitted to Evolve Bank and Trust was a "QUARTERLY STATEMENT" purporting to be from Personal Money Management Co. in San Jose, California. See **Exhibit 1**. **Exhibit 1** shows that "John P. Lopez 2939 E. Matterhorn Drive Flagstaff, AZ 86004…" is the "CLIENT" and that the all-weather fund returned 6.47%, while S&P 500 Index returned 19.41%. **Exhibit 1** also had an "Attention: Mrs. Hazel Clark"; your affiant has not identified her.

### *Wells Fargo- J. Lopez 6354*

31.     J. Lopez and M. Lopez Wells Fargo Account ending 6354 is summarized below.

SEALED

Financial Institution: Wells Fargo Bank
Account Name: Marion S Lopez, John P Lopez
Account Holder: Marion S Lopez, John P Lopez
Account #: ▮▮▮▮6354
Account Type: Personal checking
Statement Period: 10/15/2008 - 10/18/2021

|  | Beg. Balance | $ | 635.69 |
|---|---|---|---|
| **Category** | **Sum of CREDIT** | **Sum of DEBIT** | |
| ATM/Branch Currency Withdrawal | $ (60.00) | $ (41,310.00) | |
| Bank Fees | $ 164.50 | $ (2,501.65) | |
| Check - copy not provided |  | $ (383,602.14) | |
| Credit Card Advance/Payment | $ 20,122.00 | $ (511,455.92) | |
| Crypto Currency |  | $ (351,505.00) | |
| Currency Deposit | $ 177,430.00 |  | |
| Deposit - copy not provided | $ 493,157.38 |  | |
| Dining/Groceries |  | $ (35,952.98) | |
| Education |  | $ (491.04) | |
| Insurance |  | $ (26,087.63) | |
| Loan Payment | $ 2,700.00 | $ (1,548.46) | |
| Local Government | $ 4.45 | $ (14,624.31) | |
| Medical | $ 45.00 | $ (9,412.06) | |
| OneAZ CU ▮▮▮▮0062 - Marion S Lopez, John P Lopez | $ 54,200.00 |  | |
| Overdraft - WF Line of credit: ▮▮▮8712 | $ 1,997.00 |  | |
| Payment - Coin Companies |  | $ (1,854.42) | |
| Payment - Investors | $ 545,556.18 | $ (25,000.00) | |
| Payment - Miscellaneous | $ 4,973.16 | $ (10,295.57) | |
| Payroll | $ 58,175.44 |  | |
| Retail Merchant/Services | $ 1,524.66 | $ (125,295.34) | |
| Taxes | $ 376.00 | $ (13,802.96) | |
| Transfer - unknown WF account | $ 7.17 |  | |
| Utilities |  | $ (45,778.40) | |
| WF John P Lopez DBA Personal Money Management 5813 | $ 819,260.00 | $ (523,556.18) | |
| WF John P Lopez DBA Personal Money Management 8961 | $ 10,000.00 |  | |
| WF John P Lopez DBA Personal Money Management 9317 | $ 75.00 | $ (1,875.00) | |
| WF line of credit: ▮▮▮6817 | $ 2,600.00 | $ (28,013.40) | |
| WF line of credit: ▮▮▮8712 |  | $ (2,293.14) | |
| Withdrawal - copy not provided |  | $ (35,000.00) | |
| **Grand Total** | **$ 2,192,307.94** | **$ (2,191,255.60)** | |

|  | Ending Balance | $ | 1,688.03 |
|---|---|---|---|

SEALED

32.     The Wells Fargo account ending in 6354 illustrated above appears to be one of the primary personal accounts for J. Lopez and M. Lopez. From in or about September 2014, to in or about July 2018, the account had approximately $177,430.00 of currency deposited into it. From in or about March 2018, to in or about October 18, 2021, the account took in approximately $545,556.18[2] from investors. J. Lopez's and M. Lopez's Wells Fargo account ending 6354 received approximately $829,260.00 from PMMCO's Wells Fargo accounts.  J. Lopez's and M. Lopez's Wells Fargo account ending 6354 sent approximately $523,556.18 to PMMCO's Wells Fargo accounts. As such, J. Lopez's and M. Lopez's Wells Fargo account ending 6354 received a net deposit of $295,703.82, from PMMCO's Wells Fargo accounts.

**_One AZ accounts_**

33.     J. Lopez and M. Lopez had a combined personal checking at One AZ Credit Union account ending 0062. J. Lopez and M. Lopez had a combined personal savings account at One AZ Credit Union account ending 0060. PMMCO had one account at One AZ Credit Union account ending 9999. J. Lopez was the account holder, dba PMMCO.

34.     From in or about August 2013 to in or about July 2021, account ending 0062 received transfers from personal savings account ending 0060 of approximately $232,250.00, made  mortgage payments of approximately $174,024.57 for 2939 E. Matterhorn Dr. Flagstaff, and transferred approximately $48,800.00 to J. Lopez's Wells Fargo 6354.

35.     From in or about August 2013 to in or about July 2021, approximately $271,946.00 was deposited into account 0060 from Social Security, currency was withdrawn of approximately

---

[2] Included in the amount is $25,000 wire transfer from Evolve Bank from J. Lopez's account Evolve/Payward account.

SEALED

$21,180.00 from 0060, approximately $232,250.00 was transferred from 0060 to 0062, and approximately $7,950.00 was transferred from 0060 to 9999.

36.     From in or about August 2013 to in or about July 2021, various transactions resulted in approximately $38,425.00 of currency deposits into 9999 and approximately $37,000.00 transferred from 9999 to PMCO Wells Fargo account ending 5813.

## RECORDED PRESENTATION JULY 2021

37.     In July 2021, RM attended a presentation given by J. Lopez in or around Los Alamos, New Mexico. RM audio recorded the presentation and provided it to the FBI. Your affiant reviewed the recording in its entirety. J. Lopez provided the presentation attached as **Exhibit 2**. The presentation lays out a purported history of PMMCO, PMMCO's goals and objectives, historical investments returns of PMMCO. RM also provided the FBI a document of PMMCO's "Investment Product Summary", which is attached as **Exhibit 3**.

38.     RM provided a recording of the presentation referenced in Paragraph 37. J. Lopez provided background about himself, a background of PMMCO, answered questions and described the investments offerings of PMMCO.  Lopez explained PMMCO uses Charles Schwab as the "clearinghouse" for PMMCO's investors' transactions and the investors' money is held at Charles Schwab in accounts in their name. J. Lopez explained a market timing model that he utilizes which generate returns much higher than the market. J. Lopez explains he invests in the S&P 500 indexes when the market is going up. However, when the market is declining he moves investor money to treasury bonds. J. Lopez explained that none of his clients lost a penny during the 2008-2009 stock market crash, because of the aforementioned model. J. Lopez describes a "CD" offered by PMMCO which guarantees a 10% return by investing in a mix of treasury bonds and the stock market.

39.     In the presentation, J. Lopez stated, *"… let me explain right now so that uh, so that um it's, it's uh clear. Um, what I invest in… for my clients, and how I invest. Um, essentially, um, through Charles Schwab, which is the clearinghouse, um, as well as the as um whom we contract, and um essentially they, uh, they uh do the clearing of all these transactions for us as well as per- uh perform custody aah-and, and advisory services. When I say custody, that means that the money that, uh, that my clients give me, we don't actually hold.  We basically, working with uh, with Charles Schwab and Company, they basically hold the money. Um, all we simply do is that we call them and say buy this or sell that…"* J. Lopez continued saying, *"…we have a contract with Charles Schwab, um, that money then is essentially, um, um transferred to Charles Schwab, who then holds that money in your name in, in their brokerage, in their registered brokerage…"* J. Lopez further stated, *"We would go to Charles Schwab and open the account in your name with them."*

40.     J. Lopez made multiple statements in the presentation that when clients invest with PMMCO, the money is transferred into accounts held with Charles Schwab in their name. As described above, transfers from PMMCO's accounts are only to J. Lopez's Charles Schwab 0451 account.

41.     For example, on or about August 15, 2018, RS, an investor, sent approximately $1,353,336.14 via a bank wire transfer to PMMCO's Wells Fargo 5813 account. Prior to the deposit PMMCO's combined Wells Fargo accounts balance was approximately $117,446.94.  As such, the majority of the money within PMMCO's Wells Fargo accounts was RS's deposit. By on or about November 20, 2018, PMMCO's combined Wells Fargo account balances was approximately $18,832.52. From on or about August 15, 2018, to on or about November 20, 2018,

SEALED

there was approximately $15,064.71 in deposits to PMMCO's combined Wells Fargo accounts.

For the same time period, there was approximately $1,467,015.27 in withdrawals.

    a.  The withdrawals included:
1. 8/27/18- $201,000.00 wire transfer to Discount Gold and Silver Trading
2. 9/10/18- $200,000.00 wire transfer to J. Lopez's Charles Schwab 0451
3.  9/19/18- $200,000.00 wire transfer to J. Lopez's Charles Schwab 0451
4. 9/26/18- $200,000.00 wire transfer to J. Lopez's Charles Schwab 0451
5. 9/10/18- $91,616.40 check to American Bullion & Coin
6. 10/29/18- $81,880.50 check to American Bullion & Coin
7. 9/21/18- $44,000.00 check to United States Treasury for RS
8. 10/15/18- $30,000.00 check to J. Lopez's personal Wells Fargo credit card
9. 11/20/18- $30,000.00 Wells Fargo Direct pay to potential previous investor
10. 8/16/18- $25,000.00   wire transfer to J. Lopez's personal Kraken account
11. 8/21/18- $25,000.00   wire transfer to J. Lopez's personal Kraken account
12. 8/27/18- $25,000.00   wire transfer to J. Lopez's personal Kraken account
13. 8/30/18- $25,000.00   wire transfer to J. Lopez's personal Kraken account
14. 9/5/18- $25,000.00  wire transfer to J. Lopez's personal Kraken account
15. 9/10/18- $25,000.00   wire transfer to J. Lopez's personal Kraken account
16. 9/13/18- $25,000.00   wire transfer to J. Lopez's personal Kraken account
17. 11/20/18- $25,000.00 check to American Bullion & Coin
18. 9/19/18- $24,380.00 check to American Bullion & Coin
19. 9/10/18- $22,572.14 check to J. Lopez's personal Wells Fargo credit card
20. 9/20/18- $20,000.00 check to Franchise Tax Board for RS
21. 8/29/18- $15,183.59 check to Estate of MS
22. 10/12/18- $14,981.19 check to J. Lopez's personal Wells Fargo Line of Credit
23. Approximately $20,984.91 to multiple credit lines/card
24. Approximately $40,508.39 to investors
25. Approximately $24,000.00 to J. Lopez and M. Lopez 6354 Wells Fargo account
26. Approximately $5,908.15 for taxes, utilities, and bank fees.

    42.    On or about November 14, 2017, RS, an investor, sent approximately $300,000.00

via a bank wire transfer to PMMCO's Wells Fargo 5813 account. Prior to the deposit, PMMCO's

combined Wells Fargo accounts balance was approximately $2,819.90.  As such, after RS's deposit the majority of the money within PMMCO's Wells Fargo accounts was RS's. By on or about January 2, 2018, PMMCO's combined Wells Fargo account balances were approximately $12,866.44. From on or about November 14, 2017, to on or about January 2, 2018, there was approximately $25,220.14 in deposits to PMMCO's combined Wells Fargo accounts. For the same time period there was approximately $315,173.60 in withdrawals.

    b.   The withdrawals included:
1. 11/28/17- $118,625.00 wire transfer to Discount Gold and Silver Trading
2. 12/1/17- $93,875.00 wire transfer to Discount Gold and Silver Trading
3. 12/4/17-$25,000.00 transfer to J. Lopez and M. Lopez 6354 Wells Fargo account
4. 1/2/18- $16,150.68 Wells Fargo Direct payment RS, believed to be an investor
5. 12/1/17-$10,000.00 transfer to J. Lopez and M. Lopez 6354 Wells Fargo account
6. 12/15/17-$10,000.00 transfer to J. Lopez and M. Lopez 6354 Wells Fargo account
7. 11/30/17- $6,000.00 Wells Fargo Direct payment to multiple investors
8. 1/2/18- $6,000.00 Wells Fargo Direct payment to multiple investors
9. 11/24/17-$5,000.00 transfer to J. Lopez and M. Lopez 6354 Wells Fargo account
10. 12/11/17--$5,000.00 transfer to J. Lopez and M. Lopez 6354 Wells Fargo account
11. 1/2/18- $4,563.68 payment to an PR believed to be an investor
12. 12/26/17-$3,000.00 transfer to J. Lopez and M. Lopez 6354 Wells Fargo account
13. 12/21/17-$1,000.00 transfer to J. Lopez and M. Lopez 6354 Wells Fargo account
14. 11/15/17-$2,000.00 payment to CP believed to be an investor
15. 12/15/17-$2,000.00 payment to CP believed to be an investor
16. 11/17/17-$2,000.00 transfer to J. Lopez and M. Lopez 6354 Wells Fargo account
17. 12/14/17-$2,000.00 transfer to J. Lopez and M. Lopez 6354 Wells Fargo account
18. 12/29/17-$1,172.00 payment to J. Lopez's credit card
19. 11/27/17-$1,145.00 payment to J. Lopez's credit card
20. Approximately $642.24 of miscellaneous items

43.    In or about July 2021, J. Lopez represented he was able to have above average returns because *"...we are in the S&P 500 when the stock market is going up. And when the stock market decides it wants to correct, um we basically get out of the S&P 500 Index and we move into treasury bonds, which don't make a lot of money by themselves, but they're safe."* J. Lopez explained that he was able to beat all of the current banks offerings of CD investments because*, "...it's not your typical CD that essentially gets put in treasury bonds or gets put in uh, um, uh commercial, commercial debt, or even government debt. It's ss-um it's called a CD because you're essentially locked up uh and you're guaranteed this for one year [...] However, with the CD, you're gonna receive 10 percent. And so what we basically do is that we essentially, for the CD, we invest in, in uh, in a mix of treasury bonds and the stock market. Depending upon, upon um...w-what the rates are that uh that, that you just quoted, we've a-um we might uh, we might uh favor um the, the for example, treasury bonds more than, than stock, but it's basically a combination of both. So it's not your traditional CD."* J. Lopez further explained, *"Well, um, we're not a boiler room because we've been doing it for thirty six years. The average boiler room lasts maybe two or three years before the n-before, um, the government finds out and, and uh tries to shut 'em down. We're not a boiler room because boiler room cannot go thirty six years. Uh and I mean, unless they're, un-unless their totally legitimate. Um and unless they in fact have a product or a ser-uh or a service that one...continues to generate consistent returns, and, and these returns are consistently above what other, either companies are doing or what the market itself is doing. For example, I told you that, that um... the S&P 500 through, through June um was I think 14.4 percent. Ok. Um because of the way that we invested during that period, um in terms of our going into the S&P 500 and getting out, and getting back in at the appropriate time, um, our fair weather investment, which a-again basically is the S&P 500 Index, didn't do 14.4 percent. It doo-it did*

SEALED

*29.7 percent. Almost, almost twice as good as the S&P five-500. […] Because we have an indicator that also tells us, ok, it's time to get into treasury bonds. And so, while one indicator said get out, our other indicator, um, didn't tell us to get into treasury bonds, so we didn't. We just, um it just sat in, in, in cash for a small period of time. And then, and then we got back in…"* J. Lopez was later asked, *"And as far as those fair-weather investments, what, other than, is that only the S&P 500?"* J. Lopez replied *"No, again, we only invest in either the S&P 500 index or the total market index. That's it … And so that's why we invest in the S&P 500 index, and the total market index…"*

44.     As described below in the "Account Analysis" section, J. Lopez had two personal Charles Schwab accounts in his name. Your affiant reviewed PMMCO accounts, which revealed transfers only into one Charles Schwab account, and it was one of J. Lopez's personal Charles Schwab accounts. Further trading within J. Lopez's Charles Schwab 0451 and 6806 accounts from in or about August 2011, to in or about June 2021, resulted in a gain of approximately $18,121.56 and a loss of approximately $94,112.57, for a net loss of approximately $75,991.01. While J. Lopez does trade ETFs in Charles Schwab 0451 and 6806 accounts, the trading is not as successful as represented. Further, I was unable to locate purchases and/or sales of US Treasury Bonds within known PMMCO accounts. Furthermore, PMMCO's Wells Fargo accounts took in approximately $17,344,211.58 from investors and paid out approximately $6,142,032.46 to investors and/or for their benefit. PMMCO's Wells Fargo accounts paid approximately $11,431,011.10 million to coin companies and received approximately $1,907,857.42 back, for a net of approximately $9,523,153.68 paid to coin companies.  As such, I would submit the representations made by J. Lopez that returns are generated for investors by PMMCO are through buying and selling the S&P 500 and/or Treasury bonds are not true. Rather, account records reveal comingling of investors' money, investors' money going to coin shops for purchases, payments to other investors, transfers

SEALED

to J. Lopez's personal Charles Schwab investment account, currency withdrawals, and/or transfers

to J. Lopez's personal accounts.

## COOPERATING WITNESSES

45.     During the course of this investigation agents utilized Cooperating Witnesses (hereinafter "CW#1" and "CW#2") to conduct consensual recordings and conduct email correspondence with J. Lopez and others.

*CW#1*

46.     Agents approached CW#1 to act as a potential investor with J. Lopez and/or PMMCO. CW#1 agreed to assist the United States Government and act as a potential investor. CW#1 did not know J. Lopez and was not involved with PMMCO until agents approached him/her. CW#1 is willing to testify. CW#1[3] participated in recorded telephone conversations with J. Lopez. The recordings captured several conversations pertaining to the investments J. Lopez offers. CW#1 also communicated with J. Lopez via email. I consider the information CW#1 provided to be reliable because CW#1 gathered the information in the course of recorded telephone calls and an email, all of which your affiant reviewed.  To my knowledge, CW#1's information has not been found to be false or misleading.

47.     On or about August 6, 2021, CW#1 called J. Lopez and acted as a potential investor. Agents recorded the telephone call. During the call J. Lopez explained the most conservative investment PMMCO offered was a "CD" that pays 10% interest annually. J. Lopez explained that Charles Schwab is under contract with him/PMMCO to provide services and the account would be held in CW#1's name at Charles Schwab.  J. Lopez described the fair-weather strategy

---

[3] CW#1 provided Lopez with a false last name in an early telephone call. CW#1 later told Lopez his true identity.

SEALED

investment and the all-weather strategy investments. J. Lopez explained the fair-weather strategy generates income by being in the stock market when it's going up, and then moving to treasury bonds when a correction is going to occur. J. Lopez explained the all-weather strategy generates income by being in the stock market when it's going up and down. Below are excerpts from the call:

48.     J. Lopez told CW#1 the most conservative investment PMMCO has is a guaranteed 10% CD. J. Lopez further stated, *"what we do is that we put it into, into um corporate debt paying, paying anywhere from six to twelve percent.  Um we put it in longer, in longer term um treasury bonds.  Um ah, ah we, es-essentially we, we look for the highest yielding, yet safe bonds to, to put it in um so that, you know, so that we can get and justify the, the ten percent that ah that we generate on, on a yearly basis.  So it's much the same process um, it has more to do with, w-wh-ah where, where, what kind of bonds we put the money into versus what the ah banks and credit unions put the money into."*

49.     As discussed above, no known PMMCO accounts revealed purchases of US Treasury bonds. Of the approximate $17,344,211.58 PMMCO received from investors in its Wells Fargo accounts, PMMCO paid out approximately $6,142,032.46 to investors and/or for their benefit. PMMCO's Wells Fargo accounts paid approximately $11,431,011.10 to coin companies and received approximately $1,907,857.42 back, for a net of approximately $9,523,153.68 paid to coin companies.  As such, I would submit the representations made by J. Lopez that the returns generated to pay for the CD PMMCO offers through buying and selling corporate debt is not true, as the majority of what appears to be investor money goes to coin companies and/or back to investors.

SEALED

50.     J. Lopez represented to CW#1 that if CW#1 invested, "*Oh the, the, the account would basically be transferred from, from Voya um to ah, to our, our custody house which is Charles Schwab.  They basically hold the money for us…*" J. Lopez further stated, "*You know which i-you know which is um we basically would go in and buy or sell um, um a bond here or a bond there um in order to ah find the ah the best yield, which basically would support the ten percent um annual interest payment that, or rather annual in-interest rate that, that we're paying you…*"

51.     As discussed above, PMMCO and J. Lopez's accounts do not reveal trading as represented by J. Lopez.

52.     CW#1 asked J. Lopez, "*…So do you work with Schwab?  Or is Schwab, how does that all work?*" J. Lopez replied, "*Oh actually Schwab works for us.  I'm a-we-we-we are under contract which or rather (UI) Schwab is under contract with us to ah to provide the services that we need.  I mean we, we are not a broker.  They, they are the broker.  We just tell 'em what to do.*" Later, CW#1 asked J. Lopez, "*…at Schwab is the account in my name or is it in your name?  How does (UI, voices overlap)*" J. Lopez replied, "*Oh not the account is in your name.  But, b-but it's only accessible by us.*"

53.     As illustrated above, J. Lopez represented to CW#1 that PMMCO has a contract with Charles Schwab, and, when investing with PMMCO, a Charles Schwab account would be created in the investor's name. As described above, transfers from PMMCO's Wells Fargo accounts have only been to J. Lopez's personal Charles Schwab account 0451. As such, I submit the representations made by J. Lopez regarding Charles Schwab are false.

54.     J. Lopez described the investments PMMCO offers. "*… [W]e have the, the guaranteed ten percent […] we have something called um stable growth and income investment*

*which basically invests in a combination of stocks and bonds and, and that ah over a, over a twenty year average does somewhere around fifteen to seventeen percent […] if you wanna go another um up another level of risk ah, ah to a, you might say moderate risk, ah then, then we have what we call the fair-weather strategy um investment.  Which basically invests in the stock market.  No bonds.  Um, invests in the stock market when it's going up.  And then what ah, and then when the stock market looks like it's going to um suffer um a correction of, of, of any significance, we basically pull that money out.  And, and put it into, into treasury bonds until, until all the carnage is, and, and um all the correction is over.  And then we've hit bottom and then we basically put the money back in a better, we'll take it out of the treasury bonds and move it back into the stock market[…]our highest risk, and most aggressive investment is what we call the all-weather strategy.  Which is in the market of both ah both when it's going up and when it's going down[…]And so we simply shift from one to the other so that at our most aggressive we're always invested in stocks of some kind."*

55.     As discussed above, based on your affiant's review of PMMCO and J. Lopez's accounts, the trades and/or returns are not consistent with J. Lopez's representations.

56.     CW#1 asked, *"So in the past, have you ever lost any money?  I'm, the way it sounds like you, you guys are pretty bright and you're able to make always havin' a high return."* J. Lopez replied, *"Yeah well um the the, the reality is that you know we might lose um a little money on a day by day basis, but, but over a monthly, quarterly, and definitely an annual basis we don't lose money […] Our approach is it's um, it's more a case of we want it to be in the market when the market is going up, and we want to move out of harm's way when the market is going down…"*

57.     As discussed above, the only money transferred from PMMCO into a brokerage account was to J. Lopez's personal Charles Schwab account 0451. Further, the trading in J. Lopez's

SEALED

Schwab accounts 0451 and 6806 from in or about August 2011, to in or about June 2021, resulted in a gain of approximately $18,121.56 and a loss of approximately $94,112.57, for a net loss of approximately $75,991.01.  As such, I submit the representations made by J. Lopez about not losing money on an annual basis are false.

58.    J. Lopez provided a document via email to CW#1. The document is attached as **Exhibit 4**. As illustrated on **Exhibit 4**, PMMCO reported 20 year performance of the stable growth, fair-weather, and all-weather investments of 15.2%, 27.3% and 42.4%, respectively. The S&P return for the same 20 year period is represented to be 6.4%.

*CW#2*

59.    Agents approached CW#2 to act as a potential investor with J. Lopez and/or PMMCO. CW#2 agreed to assist the United States Government and act as a potential investor. CW#2 did not know J. Lopez and was not involved with PMMCO until agents approached him/her. CW#2 is willing to testify. Agents and CW#2 used covert recording devices to record telephone calls and in person meetings with J. Lopez. CW#2 also communicated with J. Lopez via email. CW#2 invested $12,000 with J. Lopez, dba PMMCO provided to him/her by the United States Government. CW#2 was advised and agreed he/she had no right, title, or interest in the money the United States Government provided him/her and the money, if any remained, would revert to the United States Government at the conclusion of the investigation. I consider the information CW#2 provided to be reliable because the information gathered by CW#2 was mostly recorded telephone calls[4], an in person recorded meeting, and emails, all of which your affiant reviewed. To my knowledge, CW#2's information has not been found to be false or misleading.

[4] One of CW#2's telephone conversation with Lopez was not recorded. However, CW#2 was debriefed regarding telephone call and it was memorialized.

26

SEALED

60.     On or about August 3, 2021, CW#2 made his/her first contact with J. Lopez, via a telephone call. Agents recorded the telephone call. CW#2 asked for "John Lopez" and the individual who answered the telephone call identified himself as J. Lopez. CW#2 posed as an interested investor. J. Lopez explained some of the investments that he offered. A potential in person meeting towards the end of August 2021, in Albuquerque, New Mexico, was discussed.

61.     On or about August 19, 2021, CW#2 called J. Lopez. J. Lopez and CW#2 agreed to meet at "four o'clock on the 28th." J. Lopez explained he would be in Espanola and then go to Albuquerque to meet CW#2. CW#2 requested additional information regarding investments J. Lopez offered. J. Lopez was driving and asked CW#2 to send CW#2's email address.

62.     On or about August 19, 2021, the user[5] of jplopez@startmail.com sent an email to CW#2. Within the email user of jplopez@starmail.com described the following investments. The email was signed only by J. Lopez:

   a.   1 Year 'Certificate of Deposit with guaranteed 10% Yield- Within the email J. Lopez described the investment guarantees the 10% no matter how the bond market is doing. He does this by the purchasing and sales of bond ETFs at key inflection points, so they can benefit from the interest and the appreciation of the bonds.

   b.   All-weather strategy investment- Within the email J. Lopez described the investment is for aggressive or high risk investors. Further, J. Lopez went on to explain that it uses market timing strategy with ETFs. J. Lopez represents the All-weather fund is in the stock market whether it is rising or falling, just a difference of which ETFs the money is invested in.

---

[5] Your affiant reviewed multiple emails from jplopez@starmail.com. Some of the emails from jplopez@starmail.com were purported to be sent by J. Lopez and/or Avina.

SEALED

63.     J. Lopez further explained the all-weather strategy investment, as an investment that benefits regardless of whether the stock market rises or declines. J. Lopez stated the investment steadily gained over the years and beat most stock market indexes. J. Lopez stated in the email, "…*we are in some stock ETFs which benefit when it's rising, and different stock ETFs which benefit when the stock market is declining. This is how this investment is able to generate superior returns…*"

64.     On or about August 24, 2021, CW#2 replied to the email, confirming a meeting in Albuquerque, New Mexico. Further, CW#2 asked for descriptions of other investments J. Lopez offered. On or about August 24, 2021, the user of jplopez@startmail.com sent an email to CW#2. Within the email user of jplopez@starmail.com described the following investments. The email was signed only by J. Lopez:

a.  The Stable Growth and Income Strategy Investment- Within the email J. Lopez described the investment seeks to generate gains and income through specific mix of stocks and short term fixed income instruments, like bonds or insurance contracts. Further, J. Lopez went on to explain that this investment uses market timing strategy. J. Lopez later discussed the fixed income components as purchasing US Treasury Bonds, corporate bonds or insurance contracts with maturity dates no longer than one year.

b.  The fair-weather strategy investment- Within the email J. Lopez described it as being similar to the all-weather strategy investment, with one key difference. The main difference is at the "inflection point" the fair-weather fund shifts into US Treasury Bond ETFs during the stock market decline.

28

SEALED

65.     As described above in the "Account Analysis" section, J. Lopez had two personal Charles Schwab accounts in his name. Your affiant reviewed PMMCO accounts, which revealed transfers only into one Charles Schwab account, and it was J. Lopez's personal Charles Schwab account ending 0451. Further, the trading in J. Lopez's Schwab accounts 0451 and 6806 from in or about August 2011, to in or about June 2021, resulted in a gain of approximately $18,121.56 and a loss of approximately $94,112.57, for a net loss of approximately $75,991.01. While J. Lopez trades ETFs in his Charles Schwab 0451 and 6806 accounts, the trades are not as successful as represented. Further, I was unable to locate purchases and/or sales of US Treasury Bonds within known PMMCO accounts. Furthermore, PMMCO's Wells Fargo accounts took in approximately $17,344,211.58 from investors and paid out approximately $6,142,032.46 to investors and/or for their benefit. PMMCO's Wells Fargo accounts paid approximately $11,431,011.10 to coin companies and received approximately $1,907,857.42 back, for a net of approximately $9,523,153.68 paid to coin companies.   As such, I would submit the representations made by J. Lopez that returns are generated for investors by PMMCO are through buying and selling the S&P 500 and/or Treasury bonds are not true. Rather, account records reveal a comingling of investors' money, investors' money going to coin shops for purchases, payments to other investors, transfers to J. Lopez's personal Charles Schwab investment account, currency withdrawals, and/or transfers to J. Lopez's personal accounts.

66.     On or about August 27, 2021, J. Lopez met with CW#2 in Albuquerque, New Mexico. Agents recorded the meeting. During the meeting, J. Lopez provided CW#2 background on himself and PMMCO. Agents observed J. Lopez arrive and depart from the meeting with CW#2 in an Audi, from which J. Lopez took what appeared to be documents into meeting. J. Lopez has a 2001 Audi A6 registered with license plate LKF219. J. Lopez represented that PMMCO had a

contract with Charles Schwab where investors' money is maintained. J. Lopez explained that he is moving away the debt previously invested in, such as treasury bonds, and moving to government inflation adjusted bonds. CW#2 discussed the potential of investing with PMMCO.  Below are excerpts from the meeting:

67.    J. Lopez told CW#2, *"...I mean other than, other than essentially a handful of kind of investments and most of those investments are either um very specific US treasury um bond type of investments or market basket investments... or, or um, groups of investments like the S&P 500 market, market basket, or the Vanguard total market basket. The reason being is that, is that, there, there is a mountain of data with regards to various aspects of uh, of these, of these indexes"*

68.    As discussed above, based on your affiant's review of PMMCO and J. Lopez's accounts, the trades and/or returns are not consistent with J. Lopez's representations.

69.    J. Lopez told CW#2, *"Uh no, um actually we have a contract with, with Charles Schwab who basically maintains the custody of the money um for your accounts..."*

70.    As illustrated above, J. Lopez represented to CW#2 that PMMCO has a contract with Charles Schwab. As described above, transfers from PMMCO's Wells Fargo accounts have only been to J. Lopez's personal Charles Schwab account 0451. As such, I submit the representations made by J. Lopez regarding Charles Schwab are false.

71.    When CW#2 brought up inflation to J. Lopez, J. Lopez responded with, *"Right, right. And, and, that's something that we have to come to terms with, but, um, but we have a number of strategies, um, to be able to do that. Not that we're moving away from debt, but we're moving away from the kind of debt that that we had typically been using, for example, um right now we've been using treasury bonds because treasury bonds are selling. Um, however, um, there, there's also called, um, inflation- um, government inflation adjusted bonds. Um, and, and*

*previously we had essentially left them alone because we saw no need or value to essentially pay the additional premium to uh, to protect against inflation. Um, they're called tips by the way. Treasury inflation, protection- protected securities. Tips."*

72.     As discussed above, based on your affiant's review of PMMCO and J. Lopez's accounts, the trades and/or returns are not consistent with J. Lopez's representations.

*CW#2 Investment*

73.     On or about September 3, 2021, CW#2 sent $12,000 of United States Government funds via wire transfer from US Bank to PMMCO utilizing a "Bank Wire Transfer Instructions" provided by J. Lopez, attached as **Exhibit 5**. The wire was sent to PMMCO's Wells Fargo account ending 5813. I have reviewed PMMCO's Wells Fargo September 2021, 5813 and 8961 account statements[6]. The $12,000 wired to PMMCO's 5813 account was received on or about September 3, 2021. From on or about September 3, 2021, to on or about September 21, 2021, the following were the withdrawals from the PMMCO 5813 and 8961Wells Fargo accounts:

      a.  9/3/2021- $15.00- bank fee
      b.  9/7/2021- $500.00- Chase credit card payment
      c.  9/9/2021- $306,800.00 wire transfer to Discount Gold and Silver
      d.  9/9/2021-$30.00 of multiple bank fees
      e.  9/9/2021-$565,000 withdrawal via check (not provided)[7]
      f.  9/10/2021-$15,104.35 wire transfer to investors
      g.  9/10/2021- $1,000 payment to Avina
      h.  9/15/2021- $21,092.78 payment to IRS
      i.  9/15/2021-$208.00 payment to IRS
      j.  9/15/2021- $4,000 payment to investor
      k.  9/15/2021- $1,500 payment to investor
      l.  9/17/2021- $1,000 payment to Avina

---

[6] Not all incoming and outgoing money had supporting documentation provided by Wells Fargo. However, your affiant spoke with an employee of Wells Fargo, and on preliminary review no transfers/checks were sent to Charles Schwab from 5813 and 8961 through from on or about September 3, 2021, to on or about September 21, 2021.
[7] Wells Fargo employee preliminary review revealed the check was to LPL Financial.

SEALED

74.     On or about September 21, 2021, CW#2 called J. Lopez. Agents recorded the telephone call.  J. Lopez told CW#2 that CW#2's investment was up 2%, for the month, while the market was down 3%, for the month. J. Lopez stated he moved the all-weather fund investments out of the stocks and ETFs that do well when the market is going up, to ETFs that do well when the market goes down. Thus, the all-weather fund outperformed the market.  J. Lopez confirmed everything being done for CW#2 was in Charles Schwab.

75.     On or about October 4, 2021, CW#2 received an emailed from J. Lopez and Avina. The email contained CW#2's account statement for the quarter ending September 30, 2021. The account statement is attached as **Exhibit 6**[8].

76.     CW#2 received a second email on or about October 4, 2021. The email is attached as **Exhibit 7**[9]. I submit there is probable cause to believe is an email sent to multiple investors for the purpose of lulling investors and giving them a false sense of security in their investment gains. The email provided an updated summary of investment returns, which far exceeded the S&P index. As discussed above, based on your affiant's review of PMMCO and J. Lopez's accounts, the trades and/or returns are not consistent with J. Lopez's representations.

## **SUMMARY**

77.     In summation, I submit probable cause exists that J. Lopez engaged in a series of fraudulent acts both individually and through PMMCO which are characteristic of High Yield Investment Frauds and/or Ponzi schemes.  Although not statutorily defined, perpetrators of High Yield Investment Frauds tell victims that they can earn above market returns with little or no risk.  Victims are often sent fictitious statements which tell the victim that the value of their

---

[8] Exhibit has been redacted to protect CW#2's identity.
[9] Exhibit has been redacted to protect CW#2's identity.

SEALED

investment has grown.  The term "Ponzi" is used to describe a financial arrangement in which the perpetrator uses one investor's money to pay another investor.

78.     J. Lopez represents that PMMCO has been in business over 30 years. J. Lopez offers multiple different types of investments, as discussed above. J. Lopez made numerous representations regarding PMMCOs' investments during the recorded presentation and in documents provided during the presentation. J. Lopez represented guaranteed returns for PMMCO "Guaranteed Monthly Benefit" in **Exhibit 2**. Further, J. Lopez represented 20 year returns far above the market.   Further, J. Lopez made multiple representations and provided numerous documents to CW#1 and CW#2 that are not in line with the examination of PMMCO's and/or  J. Lopez's bank statements. J. Lopez represents PMMCO is able to have guaranteed returns and higher rates of returns than the market based on making trades using an investment model he created years ago. However, J. Lopez's accounts do not reveal the success in trading that is purported. Rather, when investor money was deposited into PMMCO's accounts, the money is used on a vast array of items including, but not limited to, transfers to J. Lopez's and M. Lopez's personal accounts, payment of J. Lopez's credit lines, payment of other investors, payment to coin companies, and transfers to J. Lopez's personal Charles Schwab account. There appears to be no segregation of accounts and no client Charles Schwab accounts; rather all investors' funds are comingled in PMMCO's Wells Fargo accounts.  J. Lopez has also withdrawn substantial amounts of cash. As such, I submit there is probable cause to believe the representations made by J. Lopez are false based on analysis of the above accounts.

## NEED FOR A SEARCH WARRANT

79.     The items sought constitute fruits, proceeds, evidence, and instrumentalities of 18 U.S.C. § 1341: Mail Fraud; 18 U.S.C. § 1343: Wire Fraud; 18 U.S.C. § 371: Conspiracy; 18 USC

§ 2: Aiding and Abetting; 18 U.S.C. § 1956: Money Laundering; 18 U.S.C. § 1957: Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity; and/or 18 U.S.C. § 1348: Securities Fraud. Further, based on my training and experience in investigating federal crimes, I know individuals involved in fraudulent and illegal activities related to false claims, theft, and false statements keep and maintain the type of records and related evidence listed in Attachment B in order to carry on their illegal activities.

80.     Based on my experience, training, and participation in investigations including experiences gained in executing search warrants for records and other evidence, I know:

a.   The records and items described in **Attachment B** are the type of records and items kept in the normal course of business for companies such as PMMCO.

b.   It is customary for individuals, businesses and related employees, agents, clients, and individuals otherwise connected with the operation of an investment company to maintain and accumulate certain types of records in order to function in the financial aspects of their lives and to otherwise continue their day-to-day operations. These records include but are not limited to items listed in **Attachment B**.

c.   That it is common for individuals who engage in fraudulent activities to maintain records or other evidence relating to their obtaining, secreting, transferring, concealing and/or expending the proceeds of their criminal activity, such as: books, records, invoices, receipts, records of real estate transactions, bank statements and related records, certificates of deposits, passbooks, money drafts, letters of credit, money orders, bank drafts, cashier's checks, bank checks, and other evidence of financial transactions. These records are often transmitted via email or as files

attached to emails. In this case, J. Lopez communicated with CW#1 and CW#2 via email, providing them documents that appear to be created on a computer.

d.   Individuals who engage in frauds, swindles, and other crimes of greed attempt to conceal their conduct by disguising their activities as legitimate transactions.

e.   Individuals engaged in financial crimes are often highly opportunistic and will frequently repeat the same pattern of activity as part of the same overall scheme. I submit that it is probable that a review of all of J. Lopez's and PMMCO's books and records, and an overall tracing of J. Lopez's and PMMCO's intake of funds and expenditures will reveal other "investors" as well as the fabricated and fraudulent documents used in furtherance of both the investment scheme.

f.   Individuals who participate in fraudulent schemes routinely conceal in their residences large amounts of currency, financial instruments, precious metals, jewelry, automobile titles, automobile keys, coins, postal money orders, airline tickets, rental car agreements, post office box rental agreements, keys to safe deposit boxes, and other items of value and/or proceeds of fraudulent schemes, money laundering activities, and evidence of financial transactions relating to obtaining, transferring, secreting, or spending large sums of money made from engaging in frauds, money laundering, and other illegal activities. In this matter, I know that J. Lopez has purchased two safes from 1-800-4A-GUNSAFE. Your affiant reviewed both invoices: one has an address of 2939 E. Matterhorn Drive, Flagstaff, AZ 86004. The safe is a Liberty Lincoln 50. The second invoice has a "SHIP TO" address of 2677 E. 7th Ave Ste 2 Flagstaff, AZ 86004. The safe is a Liberty National Classic Select Extreme 60 with an electronic lock.

SEALED

g.  Individuals who engage in illegal activity are not unlike any other individual in our society in that they maintain documents and records. These documents and records will normally be retained for long periods of time, regardless of whether their value to the individual has diminished. Oftentimes, this type of evidence is generated, maintained, and subsequently forgotten about. Hence, documents that one would normally think a prudent person would destroy because of their incriminating nature are still possessed months, or even years, after they come into the subject's possession. Oftentimes these individuals do not even realize the incriminating nature of the documents they keep or believe that others will not appreciate the incriminating nature of the material.

h.  In my training and experience, individuals who are attempting to conceal the nature of their income often conduct transactions using currency so as to be untraceable and, along with the manner in which the currency is handled, carried, and concealed, may establish a connection between the questionable currency and a fraud. In my training and experience, unexplained wealth is probative evidence of crimes motivated by greed, e.g. interstate wire fraud, bank fraud, mail fraud, and, money laundering. In this matter, J. Lopez orchestrates investment scheme where investors' money is transferred to accounts in J. Lopez's control and in J. Lopez's name. Furthermore, millions of dollars have been sent to coin companies, which I submit there is probable cause to believe the money was converted to gold, silver, and/or other commodities that are not in the investors' names and/or possession, but rather J. Lopez's possession.

i.  Individuals who engage in frauds to receive funds often attempt to legitimize or

SEALED

conceal the nature of these funds. To accomplish these goals, these individuals utilize false and fictitious business records, foreign and domestic banks, securities, cashier's checks, money drafts, wire transfers, Western Union and other money service businesses, letters of credit, brokerage houses, real estate shell corporations, and business fronts. In this matter, J. Lopez provided emails, documents, PowerPoint presentation and statements that purport returns that are not in line with an analysis of PMMCO and J. Lopez's accounts.

j.  Individuals who engage in frauds, swindles and other crimes of greed attempt to conceal their conduct by disguising their activities as legitimate business activities or transactions.  In this matter, J. Lopez submitted a PMMCO statement to Evolve Bank and Trust purporting to show that he had an account balance over $2.7 million.

k.  Individuals who engage in communication via email including the sending of electronic files attached to emails, also have a tendency to maintain the electronic records or files.  If individuals do not purposely maintain them, they often forget to delete or remove them from their email accounts.  As described elsewhere in this affidavit, J. Lopez and PMMCO engaged in the emailing of messages and exchange of files.

l.  In my training and experience, individuals involved in business and/or business owners will transport and/or store documents and/or computers in their automobiles. As described above, J. Lopez retrieved what appeared to be documents from his vehicle into the meeting with CW#2.

m.  In my training and experience, individuals who commit crimes of greed often utilize

sophisticated electronic and communication equipment to assist them in their fraud schemes, e.g. computers, facsimile machines, digital, alpha, and voice pagers, portable and cellular telephones, currency counting machines, telephone answering machines, electronic storage devices such as personal data assistants and audio and video surveillance and counter-surveillance equipment. Computer storage devices, such as diskettes, tapes, laser disks, compact digital disks, personal data assistants and others can store the equivalent of thousands of pages of information. When the user wants to conceal criminal evidence, s/he often stores it in random order with deceptive file names. J. Lopez utilized email to provide CW#1 and CW#2 information regarding PMMCO. Further, J. Lopez communicated via text message with CW#2. Furthermore, your affiant reviewed information from Centurylink, which revealed the following:

    i.   The records revealed IP address 70.59.239.191 was assigned to PMMCO at 2677 E 7th Ave, Flagstaff, Arizona Suit 2, from on or about April 9, 2021, to April 23, 2021. Your affiant reviewed records from Charles Schwab that revealed J. Lopez's account was accessed by the aforementioned IP address on or about April 12, 2021, and April 16, 2021.

    ii.   The records revealed IP address 75.167.18.33 was assigned to J. Lopez at 2939 E Matterhorn Dr, Flagstaff, Arizona 86004, from on or about April 14, 2021, to May 31, 2021. Your affiant reviewed records from Charles Schwab that revealed J. Lopez's account was accessed by the aforementioned IP address on or about April 19, 2021, April 22, 2021, and May 24, 2021.

SEALED

## SPECIFICS OF SEARCH AND SEIZURE OF COMPUTER SYSTEMS

81.     As described above and in Attachment B, this application seeks permission to search for records that might be found at the SUBJECT PREMISES and on J. Lopez, in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive or other storage media. Thus, this warrant would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

82.     I submit that if a computer or storage medium is found on the SUBJECT PREMISES and/or on J. Lopez, there is probable cause to believe the records referenced above will be stored on that computer or storage medium, for at least the following reasons:

    a.  Based on my knowledge and training, I know that forensic examiners can recover computer files or remnants of such files months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

    b.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.  Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how an individual has used a computer, what the person used it for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation; file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d.  Similarly, files that an individual viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

83.  As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described in the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the premises because:

a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of

peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which the computer created them, although it is possible for a user to later falsify this information.

b.  As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, Internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when someone accessed or used the computer or storage media. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer and the IP addresses through which the

41

SEALED

computer accessed networks and the Internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., Internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c.  A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

SEALED

d.   The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records sought, a review team cannot always readily review computer evidence or data in order to pass it along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.   Further, in finding evidence of how a person used a computer, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

f.   I know that when an individual uses a computer in an investment fraud scheme, the individual's computer will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The computer is an instrumentality of the crime because someone used it as a means of committing the criminal offense. The computer is also likely to be a storage medium for evidence of crime. From my training, I believe that a computer used to commit a crime of this type may contain evidence of how J. Lopez used the computer; sent or received data; notes as to how the criminal conduct was achieved;

SEALED

records of Internet discussions about the crime; and other records that indicate the nature of the offense.

84. Based upon my training and information relayed to me by agents and others involved in the forensic examination of computers, I know that computer data can be stored on a variety of systems and storage devices, including external and internal hard drives, flash drives, thumb drives, micro SD cards, macro SD cards, DVDs, gaming systems, SIM cards, cellular phones capable of storage, floppy disks, compact disks, magnetic tapes, memory cards, memory chips, and online or offsite storage servers maintained by corporations, including but not limited to "cloud" storage. I also know that during the search of the premises it is not always possible to search computer equipment and storage devices for data for a number of reasons, including the following:

a. Searching computer systems is a highly technical process, which requires specific expertise and specialized equipment. There are so many types of computer hardware and software in use today that it is impossible to bring to the search site all of the technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may also be necessary to consult with computer personnel who have specific expertise in the type of computer, software, website, or operating system that is being searched;

b. Searching computer systems requires the use of precise, scientific procedures, which are designed to maintain the integrity of the evidence and to recover "hidden," erased, compressed, encrypted, or password-protected data. Computer hardware and storage devices may contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Since computer data is

particularly vulnerable to inadvertent or intentional modification or destruction, a controlled environment, such as a law enforcement laboratory, is essential to conducting a complete and accurate analysis of the equipment and storage devices from which the data will be extracted;

c.   The volume of data stored on many computer systems and storage devices will typically be so large that it will be highly impractical to search for data during the execution of the physical search of the premises; and

d.   Computer users can attempt to conceal data within computer equipment and storage devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Computer users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form.  In addition, computer users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography."  For example, by using steganography a computer user can conceal text in an image file which cannot be viewed when the image file is opened. Therefore, a substantial amount of time is necessary to extract and sort through data that is concealed or encrypted to determine whether it is contraband, evidence, fruits, or instrumentalities of a crime.

85.   Additionally, based upon my training and information related to me by agents and others involved in the forensic examination of computers, I know that routers, modems, and

SEALED

network equipment used to connect computers to the Internet often provide valuable evidence of, and are instrumentalities of, a crime. This is equally true of wireless routers, which create localized networks that allow individuals to connect to the Internet wirelessly. Though wireless networks may be secured (in that they require an individual to enter an alphanumeric key or password before gaining access to the network) or unsecured (in that an individual may access the wireless network without a key or password). Wireless routers for both secured and unsecured wireless networks may yield significant evidence of, or serve as instrumentalities of, a crime—including, for example, serving as the instrument through which the perpetrator of the Internet-based crime connected to the Internet and, potentially, containing logging information regarding the time and date of a perpetrator's network activity as well as identifying information for the specific device(s) the perpetrator used to access the network. Moreover, I know that individuals who have set up either a secured or unsecured wireless network in their residence are often among the primary users of that wireless network.

86.     Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

87.     It is possible that at 2677 East 7th Ave., Suite 2 Flagstaff, Arizona 86004, to include 2001 Audi A6 Arizona License Plate LFK219, 2007 Toyota 4Runner Arizona License Plate FLRTRKR, and 1996 Nissan Truck Arizona License Plate 909AZY will contain storage media

SEALED

that are predominantly used, and perhaps owned, by persons who are not suspected of a crime.  If it is nonetheless determined that that it is possible that the things described in this warrant could be found on any of those computers or storage media, the warrant applied for would permit the seizure and review of those items as well.

## BIOMETRIC ACCESS TO DEVICES

88.     I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners, facial recognition features and iris recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

  a. If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

  b. If a device is equipped with a facial-recognition feature, a user may enable the ability to unlock the device through his or her face. For example, this feature is

SEALED

available on certain Android devices and is called "Trusted Face." During the Trusted Face registration process, the user holds the device in front of his or her face. The device's front-facing camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the front-facing camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Trusted Face.

c.   If a device is equipped with an iris-recognition feature, a user may enable the ability to unlock the device with his or her irises. For example, on certain Microsoft devices, this feature is called "Windows Hello." During the Windows Hello registration, a user registers his or her irises by holding the device in front of his or her face. The device then directs an infrared light toward the user's face and activates an infrared-sensitive camera to record data based on patterns within the user's irises. The device can then be unlocked if the infrared-sensitive camera detects the registered irises. Iris-recognition features found on devices produced by other manufacturers have different names but operate similarly to Windows Hello.

d.   In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

48

SEALED

e. As discussed in this Affidavit, I have reason to believe that one or more digital devices will be found during the search. The passcode or password that would unlock the devices subject to search under this warrant currently is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the devices, making the use of biometric features necessary to the execution of the search authorized by this warrant.

f. I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when: (1) more than 48 hours has elapsed since the device was last unlocked; or, (2) when the device has not been unlocked using a fingerprint for 8 hours *and* the passcode or password has not been entered in the last 6 days. Similarly, certain Android devices cannot be unlocked with Trusted Face if the device has remained inactive for four hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

g. Due to the foregoing, if law enforcement personnel encounter any devices that are subject to seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, I request permission to: (1) press or swipe the

49

SEALED

fingers (including thumbs) of J. Lopez to the fingerprint scanner of the devices found at the SUBJECT PREMISES or on J. Lopez; (2) hold the devices found at the SUBJECT PREMISES in front of the face of J. Lopez and activate the facial recognition feature; and/or (3) hold the devices found at the SUBJECT PREMISES in front of the face of J. Lopez and activate the iris recognition feature, for the purpose of attempting to unlock the devices in order to search the contents as authorized by this warrant. The proposed warrant does not authorize law enforcement to request that J. Lopez state or otherwise provide the password or any other means that may be used to unlock or access the devices. Moreover, the proposed warrant does not authorize law enforcement to ask J. Lopez to identify the specific biometric characteristics (including the unique finger(s) or other physical features) that may be used to unlock or access the devices.

## **CONCLUSION**

89.     I submit that this affidavit supports probable cause that the evidence, fruits and instrumentalities of violations of 18 U.S.C. § 1341: Mail Fraud; 18 U.S.C. § 1343: Wire Fraud; 18 U.S.C. § 371: Conspiracy; 18 USC § 2: Aiding and Abetting; 18 U.S.C. § 1956: Money Laundering; 18 U.S.C. § 1957: Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity; and/or 18 U.S.C. § 1348: Securities Fraud as described in Attachment B, are and will be located at 2677 East 7th Ave., Suite 2 Flagstaff, Arizona 86004 and 2001 Audi A6 Arizona License Plate LFK219, 2007 Toyota 4Runner Arizona License Plate FLRTRKR, and 1996 Nissan Truck Arizona License Plate 909AZY. A more complete description of the residence and vehicles are provided in Attachment A.

SEALED

90.     Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing

is true and correct to the best of my knowledge and belief.


  11/8/2021
Executed on (Date)                          Grant D. Nixon, Special Agent
                                            Federal Bureau of Investigation


                                            Camille D. Bibles  Digitally signed by Camille D.
                                                               Bibles
                                                               Date: 2021.11.08 09:11:17 -07'00'
___x___Sworn by telephone
                                            Hon. Camille D. Bibles
                                            U.S. Magistrate Judge

51

# QUARTERLY STATEMENT

Date: December 31, 2017
Quarter Ending: December 31, 2017

Personal Money Management Co.
467 Saratoga Avenue, Suite 609
San Jose, CA 95129
Office: 408.356.5107

CLIENT:  John P. Lopez
2939 E. Matterhorn Drive
Flagstaff, AZ 86004
Phone: 928-527-3110

Attention: Mrs. Hazel Clark

| ACCOUNT NO. | ACCOUNT NAME | | ACCOUNT TYPE | TAX STATUS |
|---|---|---|---|---|
| 0352-2742 | John P. Lopez | | 'All-Weather' Strategy Fund Investment Acct. | Taxable |
| DATE | DESCRIPTION | | DEPOSIT AMOUNT | ACCOUNT TOTAL |
| | | | | |
| 10/01/2017 | Beginning Balance of assets in 'All-Weather' Strategy Fund | | | $2,675,787.79 |
| | | | | |
| 12/31/2017 | Total Dollar ($) Gain for 4th Quarter, 2017 | | | $   99,271.73 |
| 12/31/2017 | Total Percent (%) Gain for 4th Quarter, 2017 ~ 3.71% | | | |
| | | | | |
| 12/31/2017 | Investment Account Ending Balance | | | $2,775,059.52 |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | ** 2017 Comparisons ** | | | |
| | S & P 500 Index % Gain: 19.41% | | | |
| | 'All-Weather' Strategy Fund % Gain: 6.47% | | | |
| | | | | |
| | | | Subtotal | $2,775,059.52 |
| | | | Less: Mgmt Fees | $   22,200.48 |
| | | | Account Total | $2,752,859.04 |

THANK YOU FOR YOUR SUPPORT!

**Exhibit 1**



# Personal Money Management Co. (PMMCo.)

## Union Membership Presentation
## July 15, 2021

John Lopez - President and Founder
Office Phone: (928) 714-0473

**Exhibit 2**

# Today's Presentation

▼ Introduction

▼ A bit About The Company

▼ Goals and Objectives

▼ Investments

▼ Retirement Programs

▼ Guaranteed Monthly Benefit Program Features Comparison

▼ Summary and Final Thoughts

**Exhibit 2**

# A Bit About The Company

- Personal Money Management Co.
- Established in 1985 (36 years ago)
- A Privately Held California Corporation
- Two Offices:
  - San Jose, California
  - Flagstaff, Arizona
  - Considering An Office in Espanola or Los Alamos, New Mexico
- Total Assets - A bit smaller than Zia Credit Union

**Exhibit 2**

# Company Goals and Objectives

- Primary Goal: To Grow Client Wealth and Provide Lifelong Retirement Income Security

- Nearly All Clients Come From 'Word-Of-Mouth' Referrals

- Through 'Family and Friends' Program

- No Need For Website or Internet Presence

- No Need To Advertise

- Objective: Offer the *Investments and Retirement Programs* that achieve the Primary Goal

**Exhibit 2**

# Investments

| | Risk Level | 20-Year Average Annual Return |
|---|---|---|
| 1-Year 'CD' Paying 10% Interest Per Year | Conservative | 10% |
| Stable Growth and Income Strategy Investment | Conservative | 15% |
| 'Fair-Weather' Strategy Investment | Moderate | 27% |
| 'All-Weather' Strategy Investment | Aggressive | 42% |

**Exhibit 2**

# Retirement Programs

▽ One-Year 'CD' Paying 10% Interest Yearly

  ▽ Interest paid out in a monthly or other periodic basis.

▽ Guaranteed Monthly Benefit Program

  ▽ One year contract Renewable Indefinitely.

  ▽ Monthly payout based on 20-year average of moderate risk level investment returns.



**Exhibit 2**

# Key Feature #1
## Guaranteed Monthly Benefit vs. Monthly Annuity Payment

| 401(k) Balance | Typical Monthly Insurance Company Annuity Payment | PMMCo. Guaranteed Monthly Benefit |
|---|---|---|
| $ 62,500 | $ 312.50 | $ 1,000.00 |
| $ 125,000 | $ 625.00 | $ 2,000.00 |
| $ 187,500 | $ 937.50 | $ 3,000.00 |
| $ 250,000 | $ 1,250.00 | $ 4,000.00 |
| $ 312,500 | $ 1,562.50 | $ 5,000.00 |
| $ 375,000 | $ 1,875.00 | $ 6,000.00 |
| $ 437,500 | $ 2,187.50 | $ 7,000.00 |
| $ 500,000 | $ 2,500.00 | $ 8,000.00 |

**Exhibit 2**

# Key Feature #2
## Return of Principal

- Typical Monthly Insurance Co. Annuity Payments can last for 5, 7, or 10 years.

- After monthly annuity payments have ended, original principal is _forfeited_.

- PMWCo. Guaranteed Monthly Benefit Program lasts for 1 year, and can be renewed on an annual basis _indefinitely_.

- At the end of each year, original principal remains the same.

**Exhibit 2**

# Feature #3 - Safety

- In the fine print of a typical insurance co. annuity contract, it states that annuity payments can be suspended by the insurance company.

- This occurred twice in 2008 – 2009 Great Recession

  - Metropolitan Life and Northwestern Mutual Life suspended annuity payments for up to a year.

- PMMCo. Guaranteed Monthly Benefit Program has <u>NEVER</u> had to suspend monthly payments.

  - Not for the 2008 – 2009 Great Recession, not for the 2000 - 2002 Tech Bubble Bust

9

**Exhibit 2**

# Feature #4 – Mix-n-Match

▽ Mix and Match a retirement program with an investment and tailor to your needs.

▽ Choose your retirement program

▽ Then, choose your preferred investment with the extra money that you don't need to support your Guaranteed Monthly Benefit.

▽ A typical insurance company has no such feature.

10

**Exhibit 2**

# Summary and Final Thoughts

▼ Personal Money Management Co. offers a range of Investments

  ▼ With annual investment returns consistently above industry average.

▼ and Retirement Programs

  ▼ With Guaranteed Monthly Benefit Program that significantly exceeds what annuities or similar financial products can offer.

▼ that a typical insurance co. cannot match.



**Exhibit 2**



Questions

**Exhibit 2**

## *Personal Money Management Co.*
## Investment Product Summary

For over 30 years, Personal Money Management Co. has offered a variety of quality investment products and services. As a result of our previous success, we are pleased to offer the following financial products to our clients.

## * * * Investment Options * * *

☐ **A 1-Year 'Certificate of Deposit' with a Guaranteed 10% Yield** – Ideal for conservative investors or investors who are uncomfortable with market volatility.

☐ **The Stable Growth and Income Strategy investment** - This investment seeks to provide a relatively steady annual return of **10% plus** using a conservative mix of stocks and bonds. This investment is very similar in structure to Target Date Retirement Funds offered by several large financial institutions in that it starts out as a fixed mix of stocks and bonds. This investment is ideal for conservative investors or for the investor near or in retirement.

☐ **The 'Fair-Weather' Strategy investment** - This investment seeks to benefit from the stock market gains when the stock market is trending up. When the uptrend has ended or has been broken, a shift into US Treasury debt of varying maturity occurs. When the stock market upward trend resumes, a shift out of US Treasury debt and back into the stock market occurs. This option is usually chosen by investors with a moderate risk profile or for use in retirement accounts. This option offers the stability and peace of mind of a 1-Year CD with the potential capital gains of an investment account.

☐ **The 'All Weather' Strategy investment** - This investment is usually chosen by investors with an aggressive or high-risk profile. This strategy seeks to benefit from the stock market volatility whether the stock market is rising or declining. This investment fund has steadily gained in value over its date of inception consistently beating most US stock market indexes by a substantial margin. Like the stock market itself, the year-over-year returns may vary substantially when compared to the 'Certificate of Deposit' option which offers a guaranteed **10%** yield. It is important to keep in mind that there is greater potential of significant returns with this option, but it is accompanied by higher, above-average risks as well.

## * * * Retirement Programs * * *

☐ **A 1-Year 'Certificate of Deposit' with a Guaranteed 10% Yield** – Ideal for conservative investors who are concerned about the safety of their money. **A 'Flexible' 1-Year Certificate of Deposit with a Guaranteed 10% Yield** is available to **Seniors** who need the interest paid out to them on a periodic basis.

☐ **A Guaranteed Monthly Benefit program** – Also available for those who are in or near retirement is an investment option which offers a guaranteed monthly pension-like benefit regardless of how volatile the stock market may be. This option is usually chosen by investors with a low risk profile or for use in retirement accounts.

This option offers the stability and peace of mind of a guaranteed monthly benefit accruing from the potential capital gains of an investment account. For example, an account balance of $125,000 in your PMMCo. retirement account will generate a monthly 'pension' payment of about $2,000 per month.

# Exhibit 3

**Summary of Terms and Conditions and Acknowledgements**

*The 'Certificate of Deposit' investment option acknowledgement is as follows:*

- This financial product which involves a guaranteed yield is secured by the underlying assets which have been purchased with the monies paid or invested.
- The *Guarantee* option on these products shall become in force on the day that the monies are tendered and this client agreement is signed, and will run for a period of at least one (1) year unless adjusted to a calendar year period.
- Any principal withdrawn prior to the maturity date shall only earn the reduced annual rate of interest of 0.15% per annum. The remaining monies in the 'Certificate of Deposit' shall continue to receive the 10% per annum interest rate.
- Upon the annual maturity date of this *Guaranteed* account, client has the option to renew this guarantee for a period not less than one (1) additional year.
- The fee associated with this *Guaranteed* financial account is limited to no more than $100 per calendar year.

*The Stable Growth and Income investment , The 'Fair-Weather' Strategy investment, and The 'All-Weather' investment option acknowledgements are as follows:*

- These investments have no restrictions regarding mandatory holding periods, and no fees outside of the investment fund itself other than management fees.

    o  The management fee for *the Stable Growth and Income investment* is **0.50%** per year with a minimum of $120. The normal transaction costs are covered within the fund itself.

    o  The management fee for *the 'Fair-Weather' Strategy investment account* is **0.50%** per year with a minimum of $120. The normal transaction costs are covered within the fund itself.

    o  The management fee for *the 'All-Weather' Strategy investment account* is **0.50%** per year with a minimum of $120. The normal transaction costs are covered within the fund itself.

**Personal Money Management Co.**
**Attn. John Lopez**
**PO Box 31400**
**Flagstaff, AZ 86003-1400**

**AZ Office Phone: (928) 714-0473**
**Cell Phone: (408) 203-9104**

# Exhibit 3

### *Personal Money Management Co.*
### 2021 Investment Account Performance
#### Date: July 31, 2021

| Date | S&P 500 Index | Actual Point Change | Actual % Gain or - % Loss | Risk Level - Conservative Stable Growth & Income Investment | Risk Level - Moderate 'Fair-Weather' Strategy Investment | Risk Level - Aggressive 'All-Weather' Strategy Investment |
|---|---|---|---|---|---|---|
| **Historical Averages** | | | | | | |
| 20-Year Average Annual Return % (2001-2020) | | | 6.4% | 15.2% | 27.3% | 42.4% |
| **2020 In Review** | | | | | | |
| December, 2020 | 3,756.07 | 134.44 | 3.7% | 0.8% | 4.7% | 4.7% |
| 4th Quarter, 2020 | 3,756.07 | 393.07 | 11.7% | 2.5% | 22.3% | 25.0% |
| **2021 By Month** | | | | | | |
| January, 2021 | 3,714.24 | (41.83) | -1.1% | 0.9% | 2.5% | 2.5% |
| February, 2021 | 3,811.15 | 96.91 | 2.6% | 1.6% | 5.5% | 5.5% |
| March, 2021 | 3,972.89 | 161.74 | 4.2% | 1.3% | 7.5% | 7.5% |
| April, 2021 | 4,181.17 | 208.28 | 5.2% | 1.5% | 5.4% | 5.4% |
| May, 2021 | 4,204.11 | 22.94 | 0.5% | 1.2% | 2.7% | 4.8% |
| June, 2021 | 4,297.50 | 93.39 | 2.2% | 1.2% | 2.6% | 4.0% |
| July, 2021 | 4,395.26 | 97.76 | 2.3% | 1.3% | 2.8% | 2.8% |
| **2021 By Quarter** | | | | | | |
| 1st Quarter, 2021 | 3,972.89 | 216.82 | 5.8% | 3.9% | 16.3% | 16.3% |
| 2nd Quarter, 2021 | 4,297.50 | 324.61 | 8.2% | 4.0% | 11.1% | 14.9% |
| 3rd Quarter, 2021 | 4,395.26 | 97.76 | 2.5% | 1.3% | 2.8% | 2.8% |
| **2021 Year-To-Date** | | | | | | |
| July Year-To-Date | 4,395.26 | 639.19 | 17.0% | 9.5% | 33.3% | 37.3% |

# Exhibit 4

*Personal Money Management Co.*
*PO Box 31400*
*Flagstaff, AZ 86003-1400*
*Office:  (928) 714-0473*
*Cell: (408) 203-9104*

## *Bank Wire Transfer Instructions*

---

Below is the banking information which you will need if you plan to send a bank wire transfer.

**Account Name**:     **Personal Money Management Co.**

**Address**:          **467 Saratoga Avenue, #609**
                      **San Jose, CA 95129**

**Routing Number:**   **121000248**

**Account Number:**   ███**5813**

**Bank Name:**        **Wells Fargo Bank, NA**
**Bank Address:**     **420 Montgomery Street**
                      **San Francisco, CA**

**Reference No.**     **5689-0451-1**

# Exhibit 5

# MONTHLY STATEMENT

Date: September 30, 2021
Quarter Ending: September 30, 2021

Personal Money Management Co.
PO Box 31400
Flagstaff, AZ 86003-1400
Office: 928.714.0473
Cell: 408.203.9104
Email: jplopez@startmail.com

CLIENT:

| ACCOUNT NO. | ACCOUNT NAME | | ACCOUNT TYPE | TAX STATUS |
|---|---|---|---|---|
| 1421-9231-1 | – Individual Account | | 'All-Weather' Strategy Fund | Taxable |

| DATE | DESCRIPTION | | DEPOSIT AMOUNT | ACCOUNT TOTAL |
|---|---|---|---|---|
| 09/06/2021 | Deposit Total | | $  12,000.00 | |
| 09/01/2021 | Beginning Balance | | | $          0.00 |
| | | | | |
| 09/06/2021 | Initial Deposit | | $  12,000.00 | |
| 09/30/2021 | Deposit Total | | | $  12,000.00 |
| | | | | |
| 09/06/2021 | Investment $ Gain for September, 2021 for 'All-Weather' Strategy Fund | | | |
| | Investment % Gain for September, 2021: **2.8%** | | | $      340.44 |
| | | | | |
| 09/06/2021 | Ending Balance for September, 2021 | | | $  12,340.44 |
| | | | | |
| | | | | |
| | **\* 2021 Performance Summary \*** | | | |
| | **'All-Weather' Strategy $ Gain for 2021: $ 340.44** | | | |
| | **'All-Weather' Strategy % Gain for 2021: 2.8%** | | | |
| | | | | |
| | | | Subtotal | $  12,340.44 |
| | | | Other Fees | $0.00 |
| | | | Account Total | $  12,340.44 |

THANK YOU FOR YOUR SUPPORT!

**Exhibit 6**

 Gmail

---

## September, 2021 PMMCo. Performance Summary
1 message

**JPLopez** <jplopez@startmail.com>                                    Mon, Oct 4, 2021 at 2:57 PM
To: JPLopez <jplopez@startmail.com>

Hello everyone,
Attached is the performance summary for September, 2021, the last month of the 3rd Quarter, 2021.

The full commentary will follow in a separate email in a week or so. However, here is a quick summary.

For the last several months, we have been warning of a possible stock market crash. In September, we saw the stock market decline a modest **5%**. Having prepared for this market correction, clients can see how their investments in the attached table performed or benefited.

Many investors believe that we are very near a market bottom, and that the Federal Reserve will step in to prop up the stock market once again, but I would have to disagree. I think the stock market correction/crash is only just beginning, and the Federal Reserve is taking a hands-off approach this time as the 'tapering' process commences.

There were also several disturbing developments that began to take place in September.
- First off, we are beginning to see banks and credit unions in a number of large cities putting up barricades or chain-link fences around their facilities. It first started in Philadelphia a couple of weeks ago, and has spread to New York City, Chicago, and Los Angeles so far. Are they afraid of a bank run and so are making preparations for it?
- On Friday, October 1st, we have come to learn that there was a significant banking system outage worldwide. Apparently it affected Bank of America in the US, and 20 other banks in 22 countries. Account holders lost access to their account whether it was online or in person at the local branch. They couldn't access the ATMs either. Bottom line - they were locked out of their accounts in a similar fashion to the way it happened in 2008.

If I were a betting man, I would think that these two events were linked. Could it be that these events are clear signs of what lay ahead in the month of October, or for the rest of the year?

Having said this, there is little time left to take the following steps as soon as you can:
- Stock up on extra food and water. When grocery stores close, you will have to survive on what you have stocked up on.
- Stock up on extra cash at home. When the banks close or the ATMs are empty for a period of time, you will have no way to pay for things unless you have cash.
- Stock up on extra medications and personal hygiene products. When pharmacies and stores like Target and Walmart close, you may not be able to get prescription re-fills or even toilet paper.
- If you have a generator, stock up on extra gasoline. When the power goes out for any length of time, you will need the generator and gasoline to keep the food in your refrigerator or freezer from going bad.

Although some are still willing to argue with me that the September stock market decline is just a normal correction, I think that it's just a warm up for something much bigger happening in October.

# Exhibit 7

So plan accordingly.

Let me know if you have any questions. Statements are in the process of being emailed or normally mailed out as we speak.

Thanks,
John Lopez

**Office Address:**
*Personal Money Management Co.*
*2677 East 7th Avenue, Suite 2*
*Flagstaff, AZ 86004*

**Mailing Address:**
*Personal Money Management Co.*
*PO Box 31400*
*Flagstaff, AZ 86003-1400*

*Office Phone: (928) 714-0473*
*Cell Phone: (408) 203-9104*

---

**S&P 500 Historical Performance_1997-2021_093021D.pdf**
277K

# Exhibit 7

### *Personal Money Management Co.*
### 2021 Investment Account Performance
Date: September 30, 2021

| Date | S&P 500 Index | Actual Point Change | Actual % Gain or - % Loss | Risk Level - Conservative Stable Growth & Income Investment | Risk Level - Moderate 'Fair-Weather' Strategy Investment | Risk Level - Aggressive 'All-Weather' Strategy Investment |
|---|---|---|---|---|---|---|
| **Historical Averages** | | | | | | |
| 20-Year Average Annual Return % (2001-2020) | | | 6.4% | 15.2% | 27.3% | 42.4% |
| **2020 In Review** | | | | | | |
| December, 2020 | 3,756.07 | 134.44 | 3.7% | 0.8% | 4.7% | 4.7% |
| 4th Quarter, 2020 | 3,756.07 | 393.07 | 11.7% | 2.5% | 22.3% | 25.0% |
| **2021 By Month** | | | | | | |
| January, 2021 | 3,714.24 | (41.83) | -1.1% | 0.9% | 2.5% | 2.5% |
| February, 2021 | 3,811.15 | 96.91 | 2.6% | 1.6% | 5.5% | 5.5% |
| March, 2021 | 3,972.89 | 161.74 | 4.2% | 1.3% | 7.5% | 7.5% |
| April, 2021 | 4,181.17 | 208.28 | 5.2% | 1.5% | 5.4% | 5.4% |
| May, 2021 | 4,204.11 | 22.94 | 0.5% | 1.2% | 2.7% | 4.8% |
| June, 2021 | 4,297.50 | 93.39 | 2.2% | 1.2% | 2.6% | 4.0% |
| July, 2021 | 4,395.26 | 97.76 | 2.3% | 1.5% | 2.8% | 2.8% |
| August, 2021 | 4,522.68 | 127.42 | 2.9% | 1.7% | 3.7% | 3.7% |
| September, 2021 | 4,307.54 | (215.14) | -4.8% | 1.3% | 1.8% | 3.3% |
| **2021 By Quarter** | | | | | | |
| 1st Quarter, 2021 | 3,972.89 | 216.82 | 5.8% | 3.9% | 16.3% | 16.3% |
| 2nd Quarter, 2021 | 4,297.50 | 324.61 | 8.2% | 4.0% | 11.1% | 14.9% |
| 3rd Quarter, 2021 | 4,307.54 | 10.04 | 0.2% | 4.6% | 8.4% | 10.1% |
| **2021 Year-To-Date** | | | | | | |
| September Year-To-Date | 4,307.54 | 551.47 | 14.7% | 13.0% | 40.6% | 47.1% |

# Exhibit 7